# EXHIBIT 1

5/13/2026 5:18 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 114870147
By: Adiliani Solis
Filed: 5/13/2026 5:18 PM

CAUSE NO. _____

| | | |
|---|---|---|
| **J&R MULTIFAMILY GROUP, LTD,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| **FEDERAL NATIONAL MORTGAGE** | § | |
| **ASSOCIATION, and JONES LANG** | § | |
| **LASALLE MULTIFAMILY, LLC** | § | |
| *Defendants*. | § | **_____ JUDICIAL DISTRICT** |

### PLAINTIFF'S ORIGINAL VERIFIED PETITION AND APPLICATION FOR  TEMPORARY <u>RESTRAINING ORDER AND TEMPORARY INJUNCTION</u>

Plaintiff J&R Multifamily Group, Ltd. ("J&R") files its Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Federal National Mortgage Association  ("Fannie Mae") and Jones Lang LaSalle Multifamily, LLC ("JLL") (collectively, "Defendants") and respectfully shows the Court as follows:

### NATURE OF THE CASE

1. This case arises from a commercial lender's bad faith scheme to fabricate a default against a performing borrower.

2. J&R owns and operates The Worthington at the Beltway, a 362-unit multifamily apartment complex in Houston, Harris County, Texas (the "Mortgaged Property").

3. On May 5, 2020, to take advantage of historically low interest rates, J&R refinanced its mortgage loan with Defendants (Fannie Mae as the lender; JLL as the loan servicer).

4. Under the loan agreement, J&R must make its monthly loan payments and escrow / reserve deposits and "keep the Mortgaged Property in good order and repair." J&R has never missed a payment. With no genuine grounds to declare default, Defendants manufactured one.

5. On September 25, 2025, Defendants conducted a Property Condition Assessment

("PCA"). After an inspection that lasted less than one hour, during which the inspector did not even walk the entire Mortgaged Property, Defendants issued a 162-page PCA identifying $1,023,920 in purportedly "immediate repairs," including replacing the roof of every building and repairing the wooden balconies of all 362 units.

6.      The PCA's demands, however, were nonsensical on their face. **169 units did not even have balconies** and J&R had recently replaced the roofs on one of twelve buildings and completed extensive repairs on all but three buildings.

7.      Relying on their defective PCA, on November 14, 2025, Defendants demanded that J&R place $862,000 in escrow "with the Servicer [JLL]," and increase its monthly Replacement Reserve Deposit by $3,227.83 to fund the purported repairs.

8.      J&R paid—and Defendants accepted—the increased monthly deposit, but J&R did not deposit $862,000 in escrow with JLL.

9.      J&R explained to Defendants the obvious factual errors in their PCA, and in December 2025, J&R provided Defendants with its own PCA and requested a good faith meeting to reconcile the discrepancies. **Defendants ignored J&R's request for a discussion.**

10.      After ignoring J&R for months, on March 2, 2026, Defendants declared J&R in default, accelerated the loan, and threatened foreclosure for J&R's purported failure to perform impossible repairs or fund escrow for them.

11.      On March 18, 2026, J&R's counsel wrote to Defendants explaining that their declaration of default was baseless because:

- Defendants demanded that J&R repair balconies that have never existed and make nonsensical roof repairs;

- Defendants had waived their right to the $862,000 deposit under Section 13.02(a)(4) by electing the alternative remedy of an increased Monthly Replacement Reserve Deposit; and

2

- The loan agreement does not provide for direct deposit vaguely "to the Servicer."

12.     This time, Defendants did not ignore J&R. Rather, Defendants' counsel requested an inspection under the guise of entertaining good faith discussions. The parties scheduled the inspection for April 2, 2026.

13.     Unbeknownst to J&R, on March 25, 2026, and without prior notice, **JLL unilaterally depleted the escrow and reserve accounts**—the very accounts funded by J&R for repairs to the Mortgaged Property—by disbursing over half-million dollars to itself:



14.     Defendants did not respond to J&R's March 18, 2026 letter until March 31, 2026. **Defendants' response did not address a single point J&R raised**—even though JLL had already disbursed over half-million dollars to itself under the cover of its baseless default declaration.

15.     Instead, Defendants sent a Notice of *Additional* Defaults asserting new, equally baseless, grounds for defaults in lieu of addressing the mistakes with their original default claim.[1]

16.     The timing of Defendants' actions reveals their intent: On March 2nd, Defendants sent a Notice of Default under duplicitous grounds and demanded J&R deposit $862,000 into escrow. On March 18th, J&R challenged those grounds. Defendants had no response, yet on March 25th, they depleted the escrow accounts anyways. On March 31st, after they depleted the escrow

---

[1] While J&R will address these additional defaults below, Defendants have only pursued remedies (e.g. acceleration, threatened foreclosure, depletion of escrow/reserve accounts, etc.) under their original Notice of Default based on J&R's purported failure to make impossible repairs.

3

accounts, they sent a Notice of Additional Defaults.

17.     Defendants are not concerned about any actual default. Their only goal has been to pursue remedies upon default, regardless of whether any default occurred. Every action they have taken has been an outcome-driven means to justify wrongs they had already decided to commit— or the wrongs they already committed, and the obvious purpose of Defendants' Notice of Additional Defaults.

18.     On April 2, 2026,  J&R invited Defendants to a site inspection. Defendants' representatives saw with their own eyes that nearly half of the units have no balconies and that at least one roof had recently been replaced and many had undergone extensive repairs. Defendants continued the charade regardless.

19.     On April 8, 2026, after months of refusing to engage in good faith discussions, Defendants' counsel finally offered a good faith discussion, ***but only if* J&R deposited $862,000** (the same amount Defendants claimed was needed for impossible repairs) **"with the Servicer," just weeks after JLL unilaterally depleted the escrow accounts without notice**:

| | |
|---|---|
| From: | Dal Col, Devan J. |
| To: | Chen, Lincoln |
| Cc: | Bray, Haley B. |
| Subject: | RE: Worthington - Site Visit - April 2, 2026 |
| Date: | Wednesday, April 8, 2026 7:23:19 AM |

<![endif]-->
[CAUTION - EXTERNAL EMAIL] DO NOT reply, click links, or open attachments unless you have verified the sender and know the content is safe.

Lincoln,

I am writing to follow up on our Notice of Additional Default and Reservation of Rights letters. Fannie Mae is prepared to allow five (5) business days for deposit with the Servicer of the amount referenced in the Notice of Default and Acceleration dated March 2, 2026. Upon receipt of such deposit, we would welcome the opportunity to discuss completion of the required repairs and the potential for a forbearance arrangement during the repair period. In the absence of timely deposit, however, Fannie Mae intends to pursue all available remedies in accordance with the Loan Documents.

Please do not hesitate to reach out should you have any questions.

Devan

20.     Defendants' counsel's response (*i.e.*, they would "welcome an opportunity to discuss" only after J&R waives its objections to Defendants' crooked conduct) is telling, if not plainly extortionate, and the implication is clear:

21.     Defendants do not care about the facts or reality. They do not care whether J&R maintained the Mortgaged Property. Defendants only care about engineering a foreclosure, and to

4

that end, they have stripped J&R of the very funds needed to maintain the property they now claim is in disrepair. Without access to those funds, J&R cannot make needed repairs, cannot pay insurance premiums as they come due, and cannot fully discharge its obligations to its tenants.

22.    J&R therefore brings this action to enjoin Defendants' fabricated default and acceleration before they ripen into a wrongful foreclosure, to restore J&R's access to the escrow and reserve funds JLL has misappropriated, and to hold Defendants accountable for their bad-faith and predatory conduct in open court.

### DISCOVERY CONTROL PLAN

23.    Plaintiff intends to conduct discovery under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

### RULE 47 STATEMENT

24.    Plaintiff seeks both non-monetary relief and monetary relief over $250,000 but not more than $1,000,000, pursuant to Rule 47 of the Texas Rules of Civil Procedure.

### PARTIES

25.    Plaintiff J&R Multifamily Group, Ltd. ("J&R" or "Plaintiff") is a Domestic Limited Partnership organized under the laws of Texas with a principal place of business at 5711 Hillcroft Street, Suite D1, Houston, Texas 77036.

26.    Defendant Federal National Mortgage Association is a federally chartered corporation properly registered to do business in the State of Texas and may be served at 2177 Youngman Avenue, St. Paul, Minnesota 55116. Citation and service are requested at this time.

27.    Defendant Jones Lang LaSalle Multifamily, LLC is a limited liability company organized under the laws of the State of Delaware and properly registered to do business in the State of Texas. JLL may be served at 2595 N. Dallas Pkwy, Suite 350, Frisco, Texas 75034, or

5

wherever it may be lawfully found. Citation and service are requested at this time.

## JURISDICTION AND VENUE

28. The Court has jurisdiction over both the claims and the parties to this action. Plaintiff and Defendants have and do conduct business in Harris County, Texas. Venue is proper in this county under Section § 15.002 of the Texas Civil Practice and Remedies Code because all or a substantial part of the events giving rise to the claims occurred in Harris County.

## FACTUAL BACKGROUND

29. On May 5, 2020, when interest rates were at a historically low 3.19%, J&R executed a twelve-year Multifamily Loan and Security Agreement (the "Loan Agreement") with JLL to borrow $16,724,000.00 dollars. J&R used the loan to refinance the Mortgaged Property, which served as security for the loan. JLL assigned the loan to Fannie Mae, while continuing to act as loan servicer. Exhibit A-1.

30. The Loan Agreement requires J&R to pay monthly installments and keep the Property in "good order and repair." To date, J&R has never missed a payment, and at origination, JLL conducted a PCA to assess the condition of the property it was underwriting—in other words, to determine the condition in which J&R must "keep" the Mortgage Property.

### *Defendants' PCA Demanded Repairs to Nonexistent Structures*

31. On September 25, 2025, JLL conducted its second PCA.

32. JLL's PCA inspector spent less than an hour on site. Rather than inspecting the entire property, the inspector asked maintenance staff how many units there were on the Property and determined that repairs needed on some units broadly applied to all units.

33. For example, the PCA identified 362 wooden balconies that needed to be repaired:

6

| Life Safety: Items that may impact the health or sa | | | | |
|---|---|---|---|---|
| Item | Quantity | Unit | Unit Cost | Total Cost |
| Balcony repair | 362 | EA | $750.00 | $271,500.00 |

34.    The PCA further indicated that the roofs of all twelve buildings required replacement:

| | | | | |
|---|---|---|---|---|
| Roof Replacement - Asphalt Shingles/ gutters | 120,000 | SF | $3.50 | $420,000.00 |

35.    The PCA determined that all repairs were "immediate repairs" that were either "critical" or affected "life safety." However, the PCA's demands were plainly nonsensical. Only 193 units had wooden balconies, while the other 169 units did not. Also, J&R recently replaced the roof of one of the buildings and completed extensive repairs on the roof of all but three of twelve buildings.

36.    On November 14, 2025, JLL sent a formal demand to J&R to "undertake repairs… noted in JLL's PCA" (Exhibit A-2):

Demand is hereby made for Borrower to correct its failure to maintain the Mortgaged Property and immediately implement corrective action to undertake repairs and replacements of the deficiencies noted in the PCA and on Exhibit A, as well as any other repair or replacement needed at the Mortgaged Property, to the satisfaction of Fannie Mae in its sole discretion. Borrower must also perform the Additional Lender Repairs and Additional Lender Replacements within the dates listed on Exhibit A. Furthermore, Borrower must provide Fannie Mae or Servicer access, at such time and date requested by either, for inspection of the Mortgaged Property to determine the status of the required Additional Lender Repairs and Additional Lender Replacements to confirm that such repairs and replacements have been completed to Fannie Mae's satisfaction, in its sole discretion.

37.    Citing Section 13.02(a)(4) of the Loan Agreement, JLL further demanded J&R (1) deposit $862,000 "with the Servicer" within thirty days "as additional security for the Loan," and (2) increase its monthly replacement reserve deposits by $3,227.83.

38.    Under Section 13.02(a)(4) of the Loan Agreement, Fannie Mae may demand either

7

a deposit into an escrow account **or** an increase in J&R's monthly deposit if it determines there are insufficient funds in escrow to cover the demanded repairs:

> **(4)    Insufficient Funds.**
>
> Lender may, upon thirty (30) days' prior written notice to Borrower, require an additional deposit(s) to the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, or an increase in the amount of the Monthly Replacement Reserve Deposit, if Lender determines that the amounts on deposit in any of the Reserve/Escrow Accounts are not sufficient to cover the costs for Required Repairs, Required Replacements, or the Restoration or, pursuant to the terms of Section 13.02(a)(9), not sufficient to cover the costs for Borrower Requested Repairs, Additional Lender Repairs, Borrower Requested Replacements, or Additional Lender Replacements. Borrower's agreement to complete the Replacements, the Repairs, or the Restoration as required by this Loan Agreement shall not be affected by the insufficiency of any balance in the Reserve/Escrow Accounts.

39.    These remedies are mutually exclusive, yet Defendants demanded both.

40.    J&R has paid the increased monthly deposit to the reserve accounts, which Defendants have accepted. J&R did not deposit $862,000 with JLL.

### *JLL Ignored Good Faith Attempts to Reconcile Any Default*

41.    J&R does not dispute the Mortgaged Property required some repairs. In fact, J&R has always maintained its property. That doesn't mean, however, that J&R can simply accept JLL's demand. After all, under section 14.01(a)(10) of the Loan Agreement, it is an Automatic Event of Default for J&R to fail to complete any repairs that Defendants demanded in writing:

> **(a)    Automatic Events of Default.**
>
> Any of the following shall constitute an automatic Event of Default:

> (10)    any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repair Schedule or otherwise required by Lender in writing for such Repair); or

42.    Because Defendants demanded impossible repairs, these errors must be addressed before J&R commenced repairs or otherwise deposited funds for same. Otherwise, J&R would still be held in default even if they made the necessary repairs to the Mortgaged Property.

43.    On December 31, 2025, to reconcile the errors in JLL's PCA, J&R sent JLL a letter informing JLL of its mistakes (Exhibit A-3):

| I. | Roof Replacement Findings: |
|---|---|
| | The Nova PCR concluded that 100% of the roofs on the buildings at the Property require full replacement. This conclusion is inaccurate and unsupported by observable conditions. The |

| II. | Balcony Repair Findings. |
|---|---|
| | Section 2 of the Nova PCR recommends replacement of balconies on all 362 units. That assumption is factually incorrect. **Over 100 units have no balcony at all.** The PCAC report |

44.    Despite J&R's letter, monthly payments, and efforts to reconcile, Defendants refused to engage in any good faith discussions. To be clear, Defendants completely ignored J&R.

### *Defendants Declare J&R Defaulted for Failing to Make Impossible Repairs*

45.    On March 2, 2026, after ignoring J&R for months, Fannie Mae sent J&R a Notice of Default and Acceleration. Exhibit A-4.

46.    Citing Section 14.01(a)(10), Fannie Mae's notice claimed J&R defaulted on the Loan Agreement because it failed to make nonsensical repairs:

> Borrower is in default under the terms of the Loan Documents. On September 29, 2025, a Property Condition Assessment ("*PCA*") was conducted on the Property, whereby certain deficiencies were noted and identified. On November 14, 2025, Servicer sent Borrower a Notice of Demand ("***Demand Letter***") and demanded (1) that Borrower correct its failure to maintain the Mortgaged Property and immediately implement corrective action to undertake repairs of the deficiencies noted in the PCA, (2) deposit with Servicer, on behalf of Fannie Mae, within thirty (30) days of the Demand Letter an amount equal to $862,000.00 and (3) increase the Monthly Replacement Reserve Deposit by $3,227.83 per month beginning January 1, 2026.
>
> Borrower has failed to comply with the Demand Letter. Such failure constitutes an Event of Default under the Loan Documents. Pursuant to Section 14.01(a)(10) of the Loan Agreement, failure to provide satisfactory evidence of the completion of all or certain required Repairs within the time periods specified constitutes an Event of Default. Further, failure to deposit the amounts requested in the Demand Letter constitutes an automatic Event of Default pursuant to Section 14.01(a)(1) of the Loan Agreement.

47.     Fannie Mae's notice accelerated the loan and demanded immediate payment of the balance of the $16 million loan, and further threatened to "immediately institute foreclosure proceedings."

48.     On March 18, 2026, counsel for J&R sent a response letter to Fannie Mae. Exhibit A-5. J&R's response drew attention to the nonsensical nature of Fannie Mae's declaration of default, noting that Defendants' demands were not repairs at all, but to essentially turn the Mortgaged Property into something it isn't, after ignoring J&R and refusing to have an honest discussion for months.

49.     J&R's response further noted that Defendants essentially waived their rights to demand deposits by electing to accept J&R's increased monthly payments under Section 13.02(a)(4) of the Loan Agreement—given these remedies are mutually exclusive.

50.     Additionally, J&R's response noted that while Section 13.02(a)(4) of the Loan Agreement gave Defendants the right to demand deposits into certain escrow accounts that provided J&R with protections, it did not authorize Defendants to demand deposits vaguely "with the Servicer." J&R was particularly concerned about Defendants' inappropriate demand to deposit funds vaguely with the Servicer, given the suspicious nature of the Defendants' conduct in demanding impossible repairs. J&R was concerned that JLL was simply trying to misappropriate

10

funds, which is exactly what JLL did.

### *JLL Misappropriates Escrow Funds Without Notice*

51. On March 25, 2026—*after* J&R's response, which asked for a discussion to discuss inaccuracies in Defendants' PCA, and *before* Defendants' Notice of Additional Defaults—JLL unilaterally removed $581,454.89 from J&R's escrow and reserve accounts without notice and disbursed the funds to itself. Exhibit A-6.

52. These accounts exist to allow J&R to seek reimbursement for funds spent on repairs, maintenance, and insurance, among other things.

53. Because J&R was not aware that JLL had depleted the accounts, in good faith, it continued to make its regular mortgage payments and monthly escrow deposits. Specifically, J&R paid via JLL's online portal the following:

- o $91,483 on March 26, 2026;
- o $50,000 on March 27, 2026;
- o $72,214.32 on April 8, 2026; and
- o $71,500 on April 10, 2026.

54. These payments, however, never appeared in JLL's system.

55. The depletion of J&R's escrow accounts impairs J&R's ability to operate the Mortgaged Property and address the maintenance, repair, and insurance issues. The escrow and reserve accounts exist to fund repairs, upkeep and insurance, and J&R's accounts were drained without notice, explanation, or contractual justification.

### *Defendants Manufactures Additional Defaults*

56. Instead of addressing the removal of funds from J&R's accounts or the issues raised in J&R's Response letter, Fannie Mae sent another Notice of Additional Defaults and Demand for Payment on March 31, 2026.

57. To be clear, Defendants have never asserted any rights or invoked or threatened

11

any remedies based on these "additional defaults." Rather, Defendants (1) declared default and acceleration, (2) threatened foreclosure, and (3) depleted the escrow accounts all under the original March 2, 2026 claim of default that J&R failed to make impossible repairs or otherwise deposit funds for these impossible repairs. Defendants exercised these remedies before sending their "Additional Defaults" notice.

58.    In its second notice, Fannie Mae wrote that J&R had further defaulted under the Loan Agreement because it (1) failed to notify Fannie Mae of pending litigation and (2) allowed two liens to be filed against the Property. These defaults are also baseless.

59.    Notably, unlike failure to make repairs or deposit funds, there is no automatic event of default with respect to failing to notify Fannie Mae regarding pending litigation. Instead, Defendants relied on Section 14.01(c) of the Loan Agreement:

> Each failure to notify Fannie Mae of such litigation constitutes a separate Event of Default under Section 14.01(c) of the Loan Agreement. Fannie Mae is aware of at least two lawsuits which Borrower initiated and failed to notify Fannie Mae.

60.    Section 14.01(c) of the Loan Agreement is the catchall default provision pertaining to "any failure" to perform "any obligation":

> **(c)    Events of Default Subject to Extended Cure Period.**
>
> The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:
>
> (1)    any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(a) or Section 14.01(b) above) as and when required.

12

61.    Unlike specific default provisions, Section 14.01(c) has a 30-day cure period. In other words, any alleged failure to perform an obligation would not even be considered an Event of Default if it is cured, by performing the allegedly missed obligation.

62.    Here, Defendants claim J&R failed to notify them of pending litigation. Setting aside that J&R does not even have an obligation to notify Defendants regarding the subject litigation, this supposed failure can be cured by simply notifying the lender of such lawsuits within thirty days from the notice of default.

63.    J&R has since notified Defendants of the pending litigation, meaning any supposed failure has been cured. Once again, Defendants' claim of default is completely baseless.

64.    Defendants' other claim of "additional default" is equally meritless. Defendants' claim that J&R allowed two liens to be filed against the property, which they argue is an impermissible "Transfer" under Section 14.01(a)(6) of the Loan Agreement, stating that any "Transfer not permitted" by the Loan Documents is an Automatic Event of Default.

65.    Setting aside that not all liens would even be considered an impermissible Transfer under the Loan Agreement[2], Defendants' letter did not attach or even identify in any way a single lien that had been filed against the Property. Defendants baldly state that they found two liens, without ever mentioning what they found. That is because no such liens exist.

66.    J&R conducted a lien search and could not find any lien that had been filed in the past year. To the extent that Defendants are relying on a lien that was filed more than one year ago that did not result in a foreclosure—those liens have automatically lapsed under TEX. PROP. CODE § 53.157, which provides that a lien may be discharged of record by "failing to institute suit to

---

[2] Section 11.02(a)(2)(B) of the Loan Agreements provides that "any mechanic' or materialmen's liens which attach automatically… upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials[,]" are "Permitted Encumbrances."

foreclose the lien in the county in which the improvement is located within the period prescribed by Section 53.158 . . ."

### *Defendants tell J&R they will engage in Good Faith Discussions only if J&R Waives its Rights*

67.     On April 8, 2026, after J&R's repeated requests for a good faith discussion regarding Defendants' obvious improper conduct, counsel for Fannie Mae informed J&R that it would only have a good faith discussion if J&R pays the full amount Defendants' originally demanded in their March 2, 2026 Notice of Default. Exhibit A-7.

68.     Meanwhile, Defendants' conduct has prevented J&R from maintaining the Property. Nevertheless, Defendants continue to offer no reasonable explanation for their conduct.

69.     On April 30, 2026, Jay Shani of J&R emailed Kevin Sullivan of JLL, copying Matt Trent of Fannie Mae, requesting clarification regarding the disbursements JLL made to itself. Exhibit A-8. These emails have gone completely unanswered:

70.     Importantly, Mr. Shani noted in his email that the Worthington has an insurance payment coming up on May 17, 2026, and requested confirmation whether the escrowed fund will

14

be available to make the payment. Mr. Shani followed up on May 4th, May 6th, May 7th, May 8th, and May 11th. Defendants ignored every email.

71.     On May 7, 2026, J&R sent a reminder to JLL regarding a January 27, 2026 request ("Draw 24") for disbursement from the escrow accounts for repairs made to the Mortgaged Property. Exhibit A-9. To date, Defendants have wholly ignored J&R's request and all of J&R's inquiries related to Draw 24.

72.     On May 8, 2026, J&R received an invoice from its insurance carrier requesting payment by May 17, 2026. Exhibit A-10.

73.     The facts alleged herein are supported by the Affidavit of Jay Shani.

## CAUSES OF ACTION

### A.  Count I: Declaratory Judgment

74.     A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. TEX. CIV. PRAC. & REM. CODE § 37.003. A person interested under written contract or whose rights, status, or other legal relations are affected by a contract may have determined any question of construction or validity arising under the contract and obtain a declaration of rights, status, or other legal relations thereunder. TEX. CIV. PRAC. & REM. CODE § 37.004.

75.     Defendants assert that J&R is in Default because: (a) J&R has not completed the repairs identified in the September 25, 2025 PCA, including repairs to 362 wooden balconies and replacement of the roofs of all twelve buildings; (b) J&R has not deposited $862,000 "with the Servicer"; (c) J&R failed to notify Defendants of pending litigation; and (d) two unidentified liens have purportedly been filed against the Mortgaged Property.

76.     J&R is not in Default because:

15

a. The repairs Defendants demand are factually impossible. 169 of the 362 units do not have balconies. J&R replaced the roofs on four of the twelve buildings before Defendants demanded their replacement. A default cannot be predicated on failure to perform repairs that cannot, by definition, be performed.

b. Section 13.02(a)(4) of the Loan Agreement permits Defendants to elect either an additional deposit or an increase in the Monthly Replacement Reserve Deposit, not both. Defendants elected the increased Monthly Replacement Reserve Deposit on November 14, 2025, and have accepted that increased deposit every month thereafter. Defendants thereby waived any right to demand the $862,000 deposit.

c. Section 13.02(a)(4) does not authorize a deposit "with the Servicer" untethered to a specific contractual reserve or escrow account. The demand itself is unauthorized.

d. The alleged failure to notify Defendants of pending litigation is governed by Section 14.01(a)(6)'s thirty-day cure period and is not an Automatic Event of Default. J&R has since notified Defendants of the litigation, curing any purported breach.

e. No applicable lien exists. Defendants' March 31, 2026 notice does not identify any lien. J&R's lien search disclosed no lien filed against the Mortgaged Property within the past year, and any older lien has lapsed under TEX. PROP. CODE § 53.157.

77. Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Plaintiff seeks the following declarations:

16

a. The Notice of Default and Acceleration dated March 2, 2026 is invalid, unenforceable, and of no force or effect because it is not supported by any event of default under the Loan Agreement.

b. The Notice of Additional Defaults and Demand for Payment dated March 31, 2026 is invalid, unenforceable, and of no force or effect because it is not supported by any event of default under the Loan Agreement.

## B. Count II: Breach of Contract

78.    To prevail on a breach of contract claim, J&R must prove "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018) (citing *Tamuno Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied)).

79.    The Loan Agreement is a valid, enforceable contract between J&R and Defendants. J&R has performed every material obligation the Loan Agreement requires. J&R has timely made every required payment since origination in May 2020 and has kept the Mortgaged Property in good order and repair. Nevertheless, Defendants have breached Sections 13.02(a)(2), 13.02(a)(5), 13.02(a)(6), and 14.01 of the Loan Agreement.

80.    Section 13.02(a)(2) limits disbursements from the Replacement Reserve Account, Repairs Escrow Account, and Restoration Reserve Account to disbursements made on J&R's request and after satisfaction of contractual conditions. To date, Defendants refuse to honor or even respond to J&R's request for disbursement for repairs made to the Mortgage Property on January 27, 2026, despite a follow-up request on May 7, 2026. Instead, on March 25, 2026, JLL unilaterally disbursed $581,454.89 from those accounts to itself without any request from J&R, without notice, and without satisfaction of any contractual condition for disbursement.

17

81.     Sections 13.02(a)(5) and (6) require Defendants to process J&R's disbursement requests in the ordinary course. By depleting the very accounts from which those disbursements would issue, Defendants have rendered performance impossible and constructively breached J&R's disbursement rights.

82.     Section 14.01 enumerates the events that constitute Events of Default. Defendants declared default and accelerated the Loan on March 2, 2026, and again on March 31, 2026, based on events that are not Events of Default under any provision of Section 14.01, including the demand for impossible repairs under Section 14.01(a)(10) and the assertion of cured or nonexistent grounds under Section 14.01(a)(6).

83.     J&R has sustained damages as a direct result of Defendants' breaches, including the $581,454.89 misappropriated from J&R's escrow accounts, the loss of use of those funds, the inability to fund repairs and pay the May 17, 2026 insurance premium, default interest accruing under an invalid declaration of default, credit and reputational injury, and attorneys' fees and costs.

### C. Count IV: Conversion

84.     The elements of conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for the return of the property. *Huffmeyer v. Mann*, 49 S.W.3d 554, 558 (Tex. App.-Corpus Christi 2001, no pet.).

85.     J&R deposited the funds held in the escrow accounts under Section 13.02 of the Loan Agreement for the specific purpose of maintaining the Mortgaged Property. Those funds are identifiable, segregated, and held for J&R's benefit, subject to the disbursement conditions of the

18

Loan Agreement. J&R was at all times entitled to possession of those funds for their contractual purpose.

86.     On March 25, 2026, JLL assumed and exercised dominion and control over $581,454.89 of those funds by disbursing them to itself, without notice to J&R, without any disbursement request from J&R, and without satisfaction of any contractual condition authorizing the disbursement. JLL's appropriation of the funds is unauthorized, unlawful, and inconsistent with J&R's contractual right to access those funds to maintain the Mortgaged Property and pay insurance and other operating obligations.

87.     J&R has demanded an accounting and return of the funds. Jay Shani's April 30, 2026 email to Kevin Sullivan of JLLe requested clarification regarding JLL's disbursements, and J&R followed up on May 4, May 6, May 7, May 8, and May 11, 2026. Defendants have ignored every demand and have refused to return the funds.

88.     J&R has sustained damages as a direct result of Defendants' conversion, including the $581,454.89 misappropriated from J&R's escrow accounts, the loss of use of those funds, the inability to fund repairs and pay the May 17, 2026 insurance premium, default interest accruing under an invalid declaration of default, credit and reputational injury, and attorneys' fees and costs.

### D.  Violation of Texas Theft Liability Act

89.     The Texas Theft Liability Act ("TTLA") allows victims to recover for damages resulting from theft. TEX. CIV. PRAC. & REM. CODE § 134.003(a). The TTLA defines theft as the unlawful appropriation of property as described by Section 31.03 of the Texas Penal Code. TEX. CIV. PRAC. & REM. CODE § 134.002(2). Under Section 31.03, a person commits theft when he (1) unlawfully appropriates property, (2) without the owner's effective consent, and (3) with intent to deprive the owner of the property. TEX. PENAL CODE § 31.03(a), (b)(1). A "person" under the

19

TTLA includes a corporation, limited liability company, partnership, or other organized group. TEX. CIV. PRAC. & REM. CODE § 134.002(1).

90.    JLL is a "person" within the meaning of the TTLA. JLL is a limited liability company and falls squarely within § 134.002(1). JLL appropriated J&R's property. On March 25, 2026, JLL disbursed $581,454.89 from the Replacement Reserve, Repairs Escrow, and Restoration Reserve Accounts to itself.

91.    JLL took the property without J&R's effective consent. Section 13.02 of the Loan Agreement defines the limits of J&R's consent. Disbursements may issue only upon J&R's request and after satisfaction of contractual conditions. J&R submitted no disbursement request authorizing JLL's March 25, 2026 self-payment, and no contractual condition for disbursement was satisfied. JLL took the funds unilaterally, without notice, and outside the contractual framework that bounds J&R's consent.

92.    JLL acted with intent to deprive J&R of the property. JLL took the funds without notice, after J&R disputed Defendants' claims of default with uncontroverted facts, ignored J&R's demands for an accounting and return of the funds on April 30, May 4, May 6, May 7, May 8, and May 11, 2026, and continues to retain the funds to this day. The appropriation was a deliberate step in Defendants' manufactured-default scheme.

93.    J&R has sustained damages resulting from the theft. J&R is entitled to recover its actual damages, at minimum, the $581,454.89 misappropriated from the Reserve and Escrow Accounts and the $285,197.32 in monthly payments JLL has retained, court costs, and reasonable and necessary attorneys' fees. TEX. CIV. PRAC. & REM. CODE § 134.005(a)–(b).

### E.  Count V: Money Had and Received

94.    To recover on a claim for money had and received, a plaintiff must show that the

20

defendant holds money that, in equity and good conscience, belongs to him. *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951). A cause of action for money had and received "looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.). In short, it is an equitable doctrine applied to prevent unjust enrichment. *Hunt v. Baldwin*, 68 S.W.3d 117, 132 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Phippen v. Deere & Co.*, 965 S.W.2d 713, 725 (Tex. App.—Texarkana 1998, no pet.).

95.     JLL holds money that in equity and good conscience belongs to J&R. On March 25, 2026, JLL disbursed $581,454.89 from J&R's Reserve and Escrow Accounts to itself, without any contractual right to do so. Those funds were deposited by J&R under Section 13.02 of the Loan Agreement for the specific purpose of maintaining the Mortgaged Property and remain J&R's funds in equity. JLL further holds an additional $285,197.32 in payments J&R submitted through JLL's online portal, including $91,483 on March 26, 2026; $50,000 on March 27, 2026; $72,214.32 on April 8, 2026; and $71,500 on April 10, 2026.

96.     JLL has no legal or equitable basis to retain any of these funds. The justice of the case requires their return, and the equitable doctrine of money had and received bars JLL's unjust enrichment at J&R's expense.

## APPLICATION FOR TEMPORARY
## RESTRAINING ORDER AND TEMPORARY INJUNCTION

### SUPPORTING EVIDENCE

97.     This Verified Application for Temporary Restraining Order is supported by the following evidence, attached hereto and incorporated by reference:

a.  Exhibit A: Affidavit of Jay Shani

   o    Exhibit A-1: Loan Agreement (redacted)

21

○     Exhibit A-2: JLL's November 14, 2025 Demand Letter

○     Exhibit A-3: J&R's December 31, 2025 response to Demand Letter

○     Exhibit A-4: Fannie Mae's March 2, 2026 Notice of Default and Acceleration

○     Exhibit A-5: J&R's March 18, 2026 response to Fannie Mae's Notice

○     Exhibit A-6: JLL's portal printout showing disbursements

○     Exhibit A-7: Defendants' Counsel April 8, 2026 email

○     Exhibit A-8: J&R's emails requesting explanation on disbursements

○     Exhibit A-9: J&R's May 7, 2026 email regarding Draw 24

○     Exhibit A-10: Invoice for insurance premium payment

### ARGUMENTS AND AUTHORITIES

98.     J&R incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

99.     Pursuant to Rules 680 and 681 of the Texas Rules of Civil Procedure, J&R brings this Verified Application for Temporary Restraining Order and Temporary Injunction seeking both prohibitory and mandatory relief. *RP&R, Inc. v. Territo*, 32 S.W. 3d 396, 400 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (delineating mandatory injunctions that require another party to act affirmatively from prohibitory injunctions that refrain from certain conduct).

100.    Specifically, J&R seeks to halt Defendants' ongoing wrongful conduct and restore J&R's access to the very reserve and escrow funds J&R itself deposited under the Loan Agreement to fund maintenance of the Mortgaged Property. Accordingly, the relief J&R seeks is necessary to maintain the status quo. *See Cannan v. Green Oaks Apts. Ltd.*, 758 S.W.2d 753, 755.

**A.     Legal Standard**

101.    To obtain a temporary restraining order and temporary injunction, an applicant must establish: (1) a cause of action against the defendant; (2) a probable right to the relief sought;

22

and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

102. J&R seeks to stop Defendants from enforcing its baseless claim of default, including Defendants' refusal to honor J&R's contractual disbursement requests. Additionally, J&R requests the Court to order Defendants to restore the funds JLL has misappropriated from the applicable escrow accounts and compel Defendants to perform their specific contractual obligations under § 13.02 of the Loan Agreement going forward.

103. Mandatory injunctive relief is appropriate where the contractual duty is certain and specifically enforceable and the harm is not adequately remediable in damages. *In re Hardwick*, 2012 WL 3132670 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

### B. Causes of Action

104. J&R pleads valid causes of action against Defendants for: (i) declaratory judgment that no Event of Default exists under the Loan Agreement; (ii) breach of contract; (iii) conversion of the Reserve/Escrow funds; (iv) theft under the Texas Theft Liability Act, TEX. CIV. PRAC. & REM. CODE §§ 134.001 *et seq.*; and (v) money had and received. Any one of these causes of action is independently sufficient to support injunctive relief.

### C. Probable Right to the Relief Sought

105. To establish a probable right of recovery, an applicant need only put forward evidence tending to sustain the causes of action pled. It is not necessary for the applicant to prove it will ultimately prevail. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 2020).

106. **Declaratory Judgment.** J&R is likely to prevail on its Cause of Action for Declaratory Judgment that no Event of Default has occurred.

107. Section 14.01 of the Loan Agreement enumerates the events that constitute Events

23

of Default. As discussed herein, none of these events have occurred. J&R has timely made every monthly payment since the loan's May 2020 origination. Defendants' purported default rests entirely on the demand to complete repairs identified on Defendants' September 25, 2025 PCA, a 162-page document produced after an inspection of less than one hour, demanding repair of balconies on 169 units that have no balconies and replacement of roofs that J&R had already replaced. The factual predicate for the alleged default is impossible, and a default cannot be premised on the failure to perform impossible repairs.

108. Furthermore, section 13.02(a)(4) of the Loan Agreement provides that, if Lender determines reserve funds are insufficient, Lender may *either* require an additional deposit to the Replacement Reserve Account, Repairs Escrow Account, or Restoration Reserve Account *or* require an increase in the Monthly Replacement Reserve Deposit, not both. Defendants elected the latter remedy on November 14, 2025 by increasing the Monthly Replacement Reserve Deposit by $3,227.83, which J&R has paid and Defendants have accepted every month since. Having elected one alternative remedy, Defendants waived the other. (Loan Agreement, Ex. A-1, § 13.02(a)(4).)

109. Defendants' claim to Additional Defaults is either cured before it became an Event of Default (e.g. failure to notify Defendants of pending lawsuits) or factually baseless (e.g. lien filed against the Mortgaged Property).

110. **Conversion, Breach of Contract, Money Had and Received, and Violation of Texas Theft Liability Act.** Section 13.02(a)(2) of the Loan Agreement requires that disbursements from the Reserve/Escrow Accounts be made only upon J&R's request or after satisfaction of all conditions for disbursement. Since January 2026, Defendants have denied access to these accounts, and wholly ignored all inquiries relating to requests made under Section 13. JLL's March 25, 2026 unilateral disbursement of over $580,000 to itself, without notice to J&R,

24

breached § 13.02(a)(2) directly. It also constitutes conversion of identifiable funds held for specific contractual purposes (*see generally Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.—Dallas 1992, writ denied)), money had and received, and theft under TEX. CIV. PRAC. & REM. CODE § 134.003.

111.    As more fully set forth above, each of the foregoing claims is supported by evidence tending to sustain it. Therefore, J&R satisfies the probable right to relief element.

### D.    Imminent and Irreparable Injury

112.    An applicant must show probable, imminent, and irreparable injury for which damages are an inadequate remedy. *Butnaru*, 84 S.W.3d at 204.

113.    **Imminent harm.** To establish imminent harm, an applicant must show that the respondents will engage in the prohibited activity unless otherwise enjoined. *State v. Morales*, 869 S.W.2d 941, 946 (Tex. 1994). Circumstances showing imminent harm can include actual injury, a pattern of actions, or a threat or harmful action. *Huynh v. Blanchard*, 694 S.W.3d 679-680 (Tex. 2024).

114.    Since November 14, 2025, Defendants have sought to hold J&R in default based on a PCA that has no basis in reality. On December 31, 2025, Defendants pointed out the obvious errors with Defendants' PCA. Despite ignoring J&R for months, on March 2, 2026, Defendants held in default anyway, accelerated the loan, and threatened foreclosure. When J&R's counsel confronted Defendants with the factual and legal deficiencies of its claim of default, Defendants did not even attempt to address a single point made. Nevertheless, Defendants depleted the escrow accounts on March 25, 2026. Rather than addressing the uncontroverted failures of their initial fabricated default claim, on March 31, 2026, Defendants instead asserted entirely new baseless default claims to justify the wrongs that they had already committed.

25

115. Defendants' pattern of actions reflects they will stop at nothing to hold J&R in default whether they have any basis to do so or not. Defendants continue to threaten remedies such as foreclosure, and even seek to extort J&R into waiving its rights just to have a good faith discussion.

116. J&R has already sustained actual injuries as a result of Defendants' unconscionable conduct, including but not limited to the depletion of the escrow accounts J&R has been depositing funds into since origination for the purpose of maintaining the Mortgaged Property. With these accounts depleted, J&R cannot seek reimbursement for costs to maintain the Mortgaged Property.

117. Unless the Court enjoins Defendants, J&R will continue to suffer imminent and ongoing harm.

118. **Irreparable injury.** An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Harley Channelview Props., LLC v. Harley Mar, Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024).

119. Every day this manufactured default stands, J&R is contractually barred from drawing on the Reserve and Escrow Accounts it itself funded for the specific purpose of maintaining the Mortgaged Property. Without access to those funds, J&R cannot:

- o Perform timely repairs and replacements required to keep the 362-unit Mortgaged Property habitable;

- o Pay property insurance premiums when due. The next premium / renewal is due on May 17, 2026 and a lapse exposes J&R to uninsured liability and constitutes an additional automatic Event of Default under § 14.01(a)(2) of the Loan Agreement;

- o Pay property tax obligations and other operating expenses; and

- o Fulfill its obligations as landlord to its tenants who reside at the Mortgaged Property, including J&R's implied warranty of habitability under Texas Property Code § 92.052.

26

120.    Despite Defendants' pretense of holding J&R in default for failing to make fictitious repairs, after holding J&R in default, Defendants have done nothing but enrich themselves and prevent J&R from maintaining the Mortgaged Property. *County of Harris v. Southern Pacific Transp. Co.*, 457 S.W.2d 336 (Houston Civ. App., 1st Dist., 1970, no writ hist.) ("Acts which destroy or result in a serious change of property either physically or in the character in which it has been held or enjoyed have been held to do an irreparable injury.").

121.    Moreover, the Mortgaged Property is home to over 280 families who depend on J&R to continue to maintain the Mortgage Property, which it cannot do unless Defendants are enjoined. *See Butnaru*, 84 S.W.3d at 204 ("Disruption to a business can be irreparable harm."). The damage to J&R's reputation or its relationship to its tenants cannot be repaired. Defendants' continuing claim of default is likewise causing credit impairment for which there is no adequate remedy at law, and further hinders J&R's ability to obtain another loan.  Damages are inadequate when they cannot be calculated by a certain pecuniary standard, when they implicate goodwill or business reputation, or when the harm is to interests that money cannot restore. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 229 (Tex. App.—Fort Worth 2009, pet. denied).

122.    J&R seeks to enjoin Defendants from exercising their Remedies Upon Default, including foreclosure, which Defendants expressly threatened in their March 2, 2026 letter. "It is well established law that each and every piece of real estate is unique[";] thus, losing a real property interest could result in irreparable harm that could not be remedied by monetary damages. *Greater Hous. Bank v. Conte*, 641 S.W.2d 407, 410 (Tex. App.—Houston [14th Dist.] 1982, no writ) (upholding a temporary injunction preventing Greater Houston Bank from selling certain real property based on the impending irreparable loss of real property). Defendants have shown that they will not listen to reason, and unless enjoined, will continue to enforce a fictitious default.

27

123.    J&R also seeks a mandatory injunction to require Defendants to return the funds it depleted from the escrow accounts, which is necessary given Defendants' pattern of deceptive conduct. When a defendant has demonstrated a willingness to dissipate or misappropriate assets, especially when specific identifiable funds are involved, it creates a risk of irreparable harm that justifies injunctive relief. *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 298 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

124.    Defendants control both the underlying Loan and the Reserve/Escrow Accounts that hold J&R's deposits, and they have demonstrated both the willingness and the capacity to misappropriate those accounts without notice. Harm may be presumed where, as here, the parties stand in disparate positions of control and the defendant has shown a pattern of conduct calculated to defeat the applicant's contractual interests. *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 927 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

125.    Unless the Court enjoins Defendants, J&R will continue to suffer irreparable harm.

**E.      Inadequate Remedy at Law**

126.    To be entitled to injunctive relief, the applicant must plead that there is no adequate remedy at law. *Pike v. Texas EMC Mgmt.*, 610 S.W.3d 763, 792 (Tex. 2020). For a legal remedy to be adequate, it must give the applicant complete, final, and equal relief. *Henderson v. KRTS, Inc.*, 822 S.W.2d 769, 773 (Tex. App.—Houston [1st Dist.] 1992, no writ). For purposes of injunctive relief, there is no adequate remedy at law if (1) damages cannot be calculated or (2) defendant will be unable to pay damages. *Texas Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ). *See also Butnaru*, 84 S.W.3d at 204 (irreparable injury if damages cannot be measured by any certain pecuniary standard).

127.    No subsequent award of damages can repair a roof not repaired in time, restore an

28

insurance policy allowed to lapse before renewal, reverse the wrongful condition of default designed to foreclose, protect a property from risk of not being insured, or compensate a tenant injured by deferred maintenance. The harm to J&R's relationships with its tenants, and to its reputation, is precisely the kind of unquantifiable goodwill harm Texas courts treat as irreparable. *RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at \*16 (Tex. App.—Austin 2006, no pet.) (mem. op.) ("Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury.").

### *Mandatory Injunctive Relief Is Appropriate to Compel Restoration of the Misappropriated Funds and Specific Performance Under § 13.02*

128.    The function of a temporary injunction is to maintain the status quo, which is "the last, actual, peaceable, noncontested status which preceded the pending controversy." *Transport Co. of Texas v. Robertson Transports*, 261 S.W.2d 549, 553–54 (Tex. 1953). For months, J&R disputed Defendants' claim of default (arising from the faulty PCA) with uncontroverted facts, yet based solely on that alleged default, Defendants depleted J&R's escrow accounts anyway. J&R should not be punished for its good faith conduct in attempting to reason with Defendants. Accordingly, to return to the status quo before the dispute, the Court should order Defendants to return the depleted funds into the escrow accounts immediately, before J&R suffers additional irreparable harm.

129.    Furthermore, a mandatory injunction is needed where Defendants have been intent on refusing to comply with their contractual duties. Mandatory injunctive relief is appropriate where (i) the contractual duty is clear and specifically enforceable, and (ii) damages are an inadequate remedy. *Shaw v. Nachman*, 316 S.W.2d at 165–66; *Leibovitz*, 465 S.W.3d at 351–52. Both conditions are present.

130.    Section 13.02(a) of the Loan Agreement creates an unambiguous framework

whereby J&R deposits funds, Defendants hold deposited funds in specifically named accounts, then disburse funds on Borrower's request and after satisfaction of conditions. Defendants' right to retain or apply the funds outside that process arises only on a continuing Event of Default, a condition precedent that Defendants have manufactured and which does not even exist. The duty to refrain from self-disbursement and to honor proper disbursement requests is not just a matter of business judgment or discretion, it is a written contractual obligation.

131.    For the reasons set forth above, including tenant safety, insurance lapse, goodwill, reputation, and demonstrated willingness to dissipate identifiable funds, damages cannot make J&R whole. The only adequate remedy is an order restoring the funds JLL has already disbursed to itself and compelling Defendants to honor J&R's contractual disbursement rights pending trial.

132.    Texas courts routinely grant mandatory injunctive relief to compel return or restoration of specific identifiable funds and to enforce specifically enforceable contract provisions on the same facts. *See Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 610–11 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (supporting the use of mandatory injunctions to restore the status quo, even if it requires returning specific funds). *See also Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 762 (Tex. App.—Texarkana 2017, pet. dism'd) (supporting the enforcement of specifically enforceable contract provisions through injunctive relief).

### F.    Relief Requested

133.    J&R seeks a temporary restraining order and temporary injunction enjoining Defendants, and their officers, directors, employees, agents, servants, attorneys, and any persons acting in active concert or participation with them who receive actual notice of the order, from:

     a.   holding or continuing to hold J&R in Default under the Loan Agreement;

     b.   taking any action to enforce, foreclose on, accelerate, post for sale, impair J&R's credit, declare further default under or otherwise act upon the alleged Event of

30

Default declared in Defendants' March 2, 2026 Notice of Default and Acceleration or the additional defaults asserted in Defendants' March 31, 2026 Notice of Additional Defaults;

c.  relying on, asserting, or further acting upon the September 25, 2025 Property Condition Assessment or the November 14, 2025 demand letter as a basis for any default, fee, charge, or other remedy;

d.  making any disbursements from the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, except in response to a properly submitted disbursement request from J&R under § 13.02(a) of the Loan Agreement;

e.  refusing to honor J&R's properly submitted disbursement requests under § 13.02(a)(5) of the Loan Agreement;

f.  communicating with any third party (including any rating agency, secondary-market participant, insurer, vendor, or tenant) regarding the alleged default of J&R under the Loan; and

g.  transferring, assigning, selling, or otherwise disposing of any interest in the Loan or Loan Documents pending the temporary injunction hearing.

134.  J&R further seeks a temporary restraining order and temporary injunction requiring Defendants to:

a.  within one business day of the order, to restore to the applicable Reserve and Escrow Accounts the funds JLL disbursed to itself on or about March 25, 2026, in the aggregate amount of $581,454.89, with itemization of which account each restored amount is allocated to;

b.  to process J&R's future disbursement requests under § 13.02(a)(5) and (6) of the Loan Agreement in the ordinary course, on the timelines and in the amounts provided thereunder, pending final trial; and

c.  to acknowledge the loan is in good standing.

135.  The Court should set a nominal bond. The funds at issue belong, in the first instance, to J&R, having been deposited by J&R under § 13.02 of the Loan Agreement for the specific purpose of maintaining the Mortgaged Property. Defendants suffer no cognizable harm from being restrained from continuing wrongful conduct or from being required to honor their

31

contractual obligations. J&R respectfully suggests a bond not to exceed $5,000. *See, e.g., Khaledi v. H.K. Global Trading, Ltd.*, 126 S.W.3d 273, 285 (Tex. App.—San Antonio 2003, no pet.) (bond amount is within the trial court's discretion).

### G.      Request for Temporary Injunction Hearing

136.    J&R respectfully requests that the Court promptly set a hearing on this Application for Temporary Injunction within fourteen (14) days of issuance of the Temporary Restraining Order, as provided by Texas Rule of Civil Procedure 680, and that the temporary restraining order remain in effect until such hearing is held and an order on the temporary injunction is entered.

### CONDITIONS PRECEDENT

137.    All conditions precedent necessary have been performed or have occurred pursuant to Texas Rule of Civil Procedure 54 and Chapter 38 of the Texas Civil Practice and Remedies Code.

### CONCLUSION

For these reasons, Plaintiff J&R Multifamily Group, Ltd respectfully requests that Defendants Federal National Mortgage Association and Jones Lang LaSalle Multifamily, LLC be cited to appear and answer, and that the Court:

a.      Grant Plaintiff's Application for Temporary Restraining Order and Temporary Injunction as set forth herein;

b.      Order Defendants to restore $581,454.89 to the Reserve and Escrow Accounts;

c.      Declare that the March 2, 2026 Notice of Default and Acceleration is invalid, unenforceable, and of no force or effect because it is not supported by any Event of Default under the Loan Agreement;

32

d.    Declare that the March 31, 2026 Notice of Additional Defaults and Demand for Payment is invalid, unenforceable, and of no force or effect because it is not supported by any Event of Default under the Loan Agreement;

e.    Declare that, because J&R is not in default under the Loan Agreement, Defendants are not entitled to declare defaults, accelerate the indebtedness, impose default interest, or pursue any remedies based on the alleged default;

f.    Award Plaintiff actual damages, additional damages under TEX. CIV. PRAC. & REM. CODE § 134.005, attorney's fees and court costs, pre- and post-judgment interest; and

g.    Grant Plaintiff all other relief, in law and in equity, to which Plaintiff is justly entitled.

Dated: May 13, 2026              Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By: /s/ *Lincoln Chen*
    Lincoln Chen
    State Bar No. 24100148
    lincoln.chen@chamberlainlaw.com
    Christine Kirchner
    State Bar No. 00784403
    c.kirchner@chamberlainlaw.com
    Minakshi Swaminathan
    State Bar No. 24143446
    minakshi.swaminathan@chamberlainlaw.com
    1200 Smith Street, Suite 1400
    Houston, Texas  77002
    Telephone: (713) 356-1712
    Telecopier: (713) 658-2553

**ATTORNEYS FOR PLAINTIFF J&R MULTIFAMILY GROUP, LTD**

33

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aremi Dillehay on behalf of Lincoln Chen
Bar No. 24100148
aremi.dillehay@chamberlainlaw.com
Envelope ID: 114870147
Filing Code Description: Petition
Filing Description: Plaintiff's Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction
Status as of 5/14/2026 8:39 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Minakshi Swaminathan | | minakshi.swaminathan@chamberlainlaw.com | 5/13/2026 5:18:30 PM | SENT |
| Christine Kirchner | | c.kirchner@chamberlainlaw.com | 5/13/2026 5:18:30 PM | SENT |
| Lincoln Chen | | lincoln.chen@chamberlainlaw.com | 5/13/2026 5:18:30 PM | SENT |

CAUSE NO. _____

| | | |
|---|---|---|
| **J&R MULTIFAMILY GROUP, LLC,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| | § | |
| **FEDERAL NATIONAL MORTGAGE** | § | |
| **ASSOCIATION, and JONES LANG** | § | |
| **LASALLE MULTIFAMILY, LLC** | § | |
| *Defendants.* | § | **_____ JUDICIAL DISTRICT** |

## AFFIDAVIT OF JAY SHANI

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

Before me, the undersigned authority, personally appeared Mr. Jay Shani (affiant), who being by me duly sworn, deposed as follows:

1.   My name is Jay Shani. I am over twenty-one (21) years of age, am of sound mind, and am fully competent to make and execute this affidavit, which I submit in support of J&R Multifamily Group, LLC's ("J&R") Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendants Federal National Mortgage Association ("Fannie Mae") and Jones Lang LaSalle Multifamily, LLC ("JLL") (collectively, the "Defendants").

2.   I am one of the Supervisors of J&R. I have personal knowledge of every statement made herein as a result of my personal involvement and because of my experience, and all such statements are true and correct. Likewise, the exhibits to my affidavit are records that were made by persons with knowledge of the matters set forth.

3.   On May 5, 2020, when interest rates were at a historically low 3.19%, J&R executed a twelve-year Multifamily Loan and Security Agreement (the "Loan Agreement") with JLL to borrow $16,724,000.00 dollars. J&R used loan to refinance the Mortgaged Property, which served as security for the loan. JLL assigned the loan to Fannie Mae, while continuing to act as loan servicer. A true and correct redacted copy of the Loan Agreement is attached as Exhibit A-1.

4.   The Loan Agreement requires J&R to pay monthly installments and keep the Property in "good order and repair." To date, J&R has never missed a payment, and at origination, JLL conducted a PCA to assess the condition of the property it was underwriting—in other words, to determine the condition in which J&R must "keep" the Mortgage Property.

**EXHIBIT**

**A**

5.    On September 25, 2025, JLL conducted its second PCA. JLL's PCA inspector spent less than an hour on site. Rather than inspecting the entire property, the inspector asked maintenance staff how many units there were on the Property and determined that repairs needed on some units broadly applied to all units. For example, the PCA identified 362 wooden balconies that needed to be repaired. The PCA further indicated that the roofs of all twelve buildings required replacement.

6.    The PCA determined that all repairs were "immediate repairs" that were either "critical" or affected "life safety." However, only 193 units had wooden balconies, while the other 169 units did not. Also, since origination, J&R replaced the roofs on one of the buildings and completed extensive repairs on all but three buildings.

7.    On November 14, 2025, JLL sent a formal demand to J&R to "undertake repairs… noted in JLL's PCA." A true and correct copy of the November 14, 2025 letter is attached as Exhibit A-2.

8.    The letter further demanded J&R (1) deposit $862,000 "with the Servicer" within thirty days "as additional security for the Loan," and (2) increase its monthly replacement reserve deposits by $3,227.83.

9.    J&R has paid the increased monthly deposit to the reserve accounts, which Defendants have accepted. J&R did not deposit $860,000 with JLL.

10.    J&R does not dispute the Mortgaged Property required some repairs. In fact, J&R always strives to maintain its property. However, J&R could not simply accept JLL's demand because Defendants threatened to hold J&R in default so long as it failed to complete any repairs that Defendants demanded in writing.

11.    Because Defendants demanded impossible repairs, these errors must be addressed before J&R commenced repairs or otherwise deposited funds for same. Otherwise, J&R would still be held in default even if they made the necessary repairs to the Mortgaged Property.

12.    On December 31, 2025, to reconcile the errors in JLL's PCA, J&R sent JLL a letter informing JLL of its mistakes. A true and correct copy of the December 31, 2025 letter is attached as Exhibit A-3.

13.    Despite J&R's letter, monthly payments, and efforts to reconcile, Defendants refused to engage in any good faith discussions. To be clear, Defendants completely ignored J&R.

14.    On March 2, 2026, after ignoring J&R for months, Fannie Mae sent J&R a Notice of Default and Acceleration. A true and correct copy of the March 2, 2026 Notice of Default and Acceleration is attached as Exhibit A-4.

15.    Fannie Mae's notice claimed J&R defaulted on the Loan Agreement because it failed to make the aforementioned repairs. Fannie Mae's notice accelerated the loan and demanded

2

immediate payment of the balance of $16 million loan, and further threatened to "immediately institute foreclosure proceedings."

16. On March 18, 2026, J&R, through its counsel, sent a response letter to Fannie Mae's March 2, 2026 notice. J&R's March 18, 2025 response letter is attached as Exhibit A-5.

17. J&R was particularly concerned about Defendants' inappropriate demand to deposit funds vaguely "with the Servicer," given the suspicious nature of the Defendants' conduct in demanding impossible repairs. J&R was concerned that JLL was simply trying to misappropriate funds, which is exactly what JLL did.

18. On March 25, 2026, JLL unilaterally removed $581,454.89 from J&R's escrow and reserve accounts without notice and disbursed the funds to itself, however, J&R did not discover these disbursements until April 29, 2026 as JLL never provided notice. A true and correct copy of a screenshot of JLL's online portal reflecting these disbursements is attached as Exhibit A-6.

19. These accounts exist to allow J&R to seek reimbursement for funds spent on repairs, maintenance, and insurance, among other things.

20. Because J&R was not aware that JLL had depleted the accounts, in good faith, it continued to make its regular mortgage payments and monthly escrow deposits. Specifically, J&R paid via JLL's online portal the following amounts:

   o $91,483 on March 26, 2026;
   o $50,000 on March 27, 2026;
   o $72,214.32 on April 8, 2026; and
   o $71,500 on April 10, 2026.

21. These payments, however, never appeared in JLL's system.

22. Because the escrow and reserve accounts exist to fund repairs, upkeep and insurance, the depletion of J&R's escrow accounts impairs J&R's ability to operate the Mortgaged Property and address the maintenance, repair, and insurance issues.

23. Instead of addressing the removal of funds from J&R's accounts or the issues raised in J&R's Response letter, Fannie Mae sent another Notice of Additional Defaults and Demand for Payment on March 31, 2026.

24. To be clear, Defendants have never asserted any rights or invoked or threatened any remedies based on these "additional defaults." Rather, Defendants (1) declared default and acceleration, (2) threatened foreclosure, and (3) depleted the escrow accounts all under the original March 2, 2026 claim of default that J&R failed to make impossible repairs or otherwise deposit funds for these impossible repairs. Defendants invoked these remedies before sending its "Additional Defaults" notice.

3

25. In its second notice, Fannie Mae wrote that J&R had further defaulted under the Loan Agreement because it (1) failed to notify Fannie Mae of pending litigation and (2) allowed two liens to be filed against the Property.

26. Regarding the first of these "Additional Defaults," Defendants relied on Section 14.01(c) of the Loan Agreement, which is the catchall default provision pertaining to "any failure" to perform "any obligation." This provision has a 30-day cure period. In other words, any alleged failure to perform an obligation would not even be considered an Event of Default if it is cured.

27. Fannie Mae claims J&R failed to notify them of certain pending litigation, per Section 14.01(c), this alleged failure can be cured by simply notifying the lender of such lawsuits within thirty days from the notice of default. J&R notified Defendants of the pending litigation, meaning any supposed failure has been cured.

28. Fannie Mae's other "additional default" claim is that J&R allowed two liens to be filed against the property, which Fannie Mae claims is an impermissible "Transfer" under Section 14.01(a)(6) of the Loan Agreement, which states that any "Transfer not permitted" by the Loan Documents is an Automatic Event of Default.

29. Defendants' letter did attach or even identify in any way a single lien that has been filed against the Property. Defendants just state that they found two liens, without ever mentioning what they found. That is because no such liens exist.

30. J&R conducted a lien search and could not find any lien that has been filed in the past year. To the extent that Defendants are relying on a lien that was filed more than one year ago that did not result in a foreclosure.

31. On April 8, 2026, after J&R's repeated requests for a good faith discussion, counsel for Fannie Mae informed J&R that it will only have a good faith discussion if J&R pays the full amount Defendants' original demanded in their March 2, 2026 Notice of Default. A true and correct copy of Defendants' counsel's April 8, 2026 email is attached as Exhibit A-7.

32. On April 30, 2026, I emailed Kevin Sullivan of JLL, requesting clarification regarding the disbursements JLL made to itself. A true and correct copy of my April 30, 2026, and subsequent unanswered emails, is attached as Exhibit A-8. These emails have gone completely unanswered.

33. I noted in my email that the Worthington has an insurance payment coming up on May 17, 2026, and requesting confirmation whether the escrowed fund will be available to make the payment.

34. I followed up on May 4th, May 6th, May 7th, May 8th, and May 11th. Defendants ignored every email.

4

35.    On May 7, 2026, J&R followed up with JLL regarding a disbursement request made on January 27, 2026 for repairs to the Mortgaged Property, which to date, has not been paid. Exhibit A-9. Defendants have ignored J&R's request.

36.    On May 8, 2026, J&R received an invoice from its insurance carrier requesting payment by May 17, 2026 for General Liability Insurance. A true and correct copy of the invoice from The Worthington's insurance carrier is attached as Exhibit A-10.

37.    Another Insurance Invoice is forthcoming by May 15th in the amount of $138,881.45 for Property Insurance and J&R has no clear insight that Fannie Mae will disburse payment from J&R's Escrow.

Affiant further sayeth not.

_____
Mr. Jay Shani

SUBSCRIBED AND SWORN TO before me on this 13 day of May 2026.

HIRRAH DURRANI MILLER
Notary Public, State of Texas
Comm. Expires 09-15-2029
Notary ID 133332945

Notary Public, State of Texas

5

# MULTIFAMILY LOAN AND SECURITY AGREEMENT
## (NON-RECOURSE)

### BY AND BETWEEN

### J&R MULTIFAMILY GROUP, LTD., A
### TEXAS LIMITED PARTNERSHIP

### AND

### JONES LANG LASALLE MULTIFAMILY, LLC, A
### DELAWARE LIMITED LIABILITY COMPANY

### DATED AS OF

### MAY 5, 2020

Fannie Mae

{01661228.3}

**EXHIBIT
A-1**

(pages i-27 redacted)

tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

**(b)    Property Maintenance.**

Borrower shall:

(1)    pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, Repairs, and Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

(2)    keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and subject to Section 9.03(b)(3) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not any insurance proceeds received upon an event of loss or any amounts received in connection with a Condemnation Action are available to cover any costs of such restoration or repair;

(3)    commence all Required Repairs, Additional Lender Repairs, and Additional Lender Replacements as follows:

(A)    with respect to any Required Repairs, promptly following the Effective Date (subject to Force Majeure, if applicable), in accordance with the timelines set forth on the Required Repair Schedule, or if no timelines are provided, as soon as practical following the Effective Date;

(B)    with respect to Additional Lender Repairs, in the event that Lender determines that Additional Lender Repairs are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Repairs (subject to Force Majeure, if applicable), commence any such Additional Lender Repairs in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(C)    with respect to Additional Lender Replacements, in the event that Lender determines that Additional Lender Replacements are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Replacements (subject to Force Majeure, if applicable), commence any such Additional Lender Replacements in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(4)    make, construct, install, diligently perform, and complete all Replacements, Repairs, Restoration, and any other work permitted under the Loan Documents;

(A)     in a good and workmanlike manner as soon as practicable following the commencement thereof, free and clear of any Liens, including mechanics' or materialmen's liens and encumbrances (except Permitted Encumbrances and mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials);

(B)     in accordance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits, and environmental regulations;

(C)     in accordance with all applicable insurance and bonding requirements; and

(D)     within all timeframes required by Lender, and Borrower acknowledges that it shall be an Event of Default if Borrower abandons or ceases work on any Repair at any time prior to the completion of the Repairs for a period of longer than twenty (20) days (except when Force Majeure exists and Borrower is diligently pursuing the reinstitution of such work, provided, however, any such abandonment or cessation shall not in any event allow the Repair to be completed after the Completion Period, subject to Force Majeure); and

(5)     subject to the terms of Section 6.03(a), provide for professional management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing;

(6)     give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

(7)     upon Lender's written request, submit to Lender any contracts or work orders described in Section 13.02(b).

(c)     **Property Preservation.**

Borrower shall:

(1)     not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

(2)     not (or otherwise permit any other Person to) demolish, make any change in the unit mix, otherwise alter the Mortgaged Property or any part of the Mortgaged Property, or remove any Personalty or Fixtures from the Mortgaged Property, except for: (A) alterations required in connection with Repairs and Replacements; or (B) the

(pages 30-46 redacted)

**(b)     Payment Obligations Unaffected.**

The application of any awards or proceeds of a Condemnation Action to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment, Monthly Replacement Reserve Deposit, or any other installments referred to in this Loan Agreement or in any other Loan Document.

**(c)     Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

**(d)     Preservation of Mortgaged Property.**

If a Condemnation Action results in or from damage to the Mortgaged Property and Lender elects to apply the proceeds or awards from such Condemnation Action to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to any portion of the Mortgaged Property which has been damaged or destroyed in connection with such Condemnation Action and, at Borrower's expense and regardless of whether such costs are covered by insurance, clean up any debris resulting in or from the Condemnation Action, and, if required by any Governmental Authority or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 10.03(d) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

# ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS

### Section 11.01     Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 11.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)     No Labor or Materialmen's Claims.**

All parties furnishing labor and materials on behalf of Borrower have been paid in full. There are no mechanics' or materialmen's liens (whether filed or unfiled) outstanding for work, labor, or materials (and no claims or work outstanding that under applicable law could give rise to any such mechanics' or materialmen's liens) affecting the Mortgaged Property, whether prior to, equal with, or subordinate to the lien of the Security Instrument.

**(b)     No Other Interests.**

No Person:

(1)     other than Borrower has any possessory ownership or interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of existing Leases, the material terms of all such Leases having been previously disclosed in writing to Lender; or

(2)     has an option, right of first refusal, or right of first offer (except as required by applicable law) to purchase the Mortgaged Property, or any interest in the Mortgaged Property.

**Section 11.02     Covenants.**

**(a)     Liens; Encumbrances.**

Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

(1)     Permitted Encumbrances;

(2)     the creation of:

(A)     any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower has actual notice or constructive notice of the existence of such lien; or

(B)     any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(3)     the lien created by the Loan Documents.

**(b)     Transfers.**

**(1)     Mortgaged Property.**

Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

(A)     a Transfer to which Lender has consented in writing;

(B)     Leases permitted pursuant to the Loan Documents;

(C)     [reserved];

(D)     a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

(E)     the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request (including reasonable attorneys' fees and a $5,000 review fee, which shall be in lieu of any other Review Fee or Transfer Fee);

(F)     a lien permitted pursuant to Section 11.02(a) of this Loan Agreement; or

(G)     the conveyance of the Mortgaged Property following a Foreclosure Event.

**(2)     Interests in Borrower, Key Principal, or Guarantor.**

Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

(A)     any direct or indirect ownership interest in Borrower, Key Principal, or Guarantor (if applicable) if such Transfer would cause a change in Control;

(B)     a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor (if applicable);

(C)     fifty percent (50%) or more of Key Principal's or Guarantor's direct or indirect ownership interests in Borrower that existed on the Effective Date (individually or on an aggregate basis);

(D)     the economic benefits or rights to cash flows attributable to any ownership interests in Borrower, Key Principal, or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement; or

(E)     a Transfer to a new key principal or new guarantor (if such new key principal or guarantor is an entity), which entity has an organizational existence termination date that ends before the Maturity Date.

Notwithstanding the foregoing, if a Publicly-Held Corporation or a Publicly-Held Trust Controls Borrower, Key Principal, or Guarantor, or owns a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor, a Transfer of any ownership

(pages 50-61 redacted)

(3)      Borrower deposits with Lender (or the applicable Governmental Authority if required by applicable law) reserves sufficient to pay the contested Imposition, if required by Lender (or the applicable Governmental Authority);

(4)      Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested in writing by Lender; and

(5)      Borrower commences, and at all times thereafter diligently prosecutes, such contest in good faith until a final determination is made by the applicable Governmental Authority.

**(f)      Release to Borrower.**

Upon payment in full of all sums secured by the Security Instrument and this Loan Agreement and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower the balance of any Imposition Deposits then on deposit with Lender.

# ARTICLE 13 – REPLACEMENTS, REPAIRS, AND RESTORATION

**Section 13.01      Covenants.**

**(a)      Initial Deposits to Replacement Reserve Account, Repairs Escrow Account, and Restoration Reserve Account.**

(1)      On the Effective Date, Borrower shall pay to Lender:

(A)      the Initial Replacement Reserve Deposit for deposit into the Replacement Reserve Account; and

(B)      the Repairs Escrow Deposit for deposit into the Repairs Escrow Account.

(2)      After an event of loss, Borrower shall deliver or cause to be delivered to Lender any insurance proceeds received under any insurance policy required to be maintained in accordance with Article 9.

**(b)      Monthly Replacement Reserve Deposits.**

Borrower shall deposit the applicable Monthly Replacement Reserve Deposit into the Replacement Reserve Account on each Payment Date.

**(c)      Payment and Deliverables for Replacements, Repairs, and Restoration.**

Borrower shall:

(1)      pay all invoices for Replacements, Repairs, and Restoration, regardless of whether funds on deposit in the applicable Reserve/Escrow Account are sufficient to pay

the full amount of such invoices, prior to any request for disbursement from such Reserve/Escrow Account (unless Lender has agreed to issue joint checks in connection with a particular Replacement, Repair, or Restoration);

(2)     pay all applicable fees and charges of any Governmental Authority on account of the Replacements, Repairs, and Restoration, as applicable;

(3)     provide evidence satisfactory to Lender of completion of the Replacements, Restoration (within the period required under Section 9.03(b)(1)(B)(iv) or such other period required by Lender), and any Required Repairs (within the Completion Period or within such other period or by such other date set forth in the Required Repair Schedule and any Borrower Requested Repairs and Additional Lender Repairs (by the date specified by Lender for any such Borrower Requested Repairs or Additional Lender Repairs)); and

(4)     prior to commencement of any Restoration, Borrower shall deliver to Lender, for Lender's review and approval:

(A)     a copy of the plans and specifications for the Restoration; and

(B)     a copy of all building and other permits and authorizations required by any law, ordinance, statute, rule or regulation of the Governmental Authority to carry out the Restoration.

**(d)     Assignment of Contracts for Replacements, Repairs, and Restoration.**

Borrower shall collaterally assign to Lender as additional security any contract or subcontract for Replacements, Repairs, or Restoration, upon Lender's written request, on a form of assignment approved by Lender.

**(e)     Indemnification.**

If Lender elects to exercise its rights under Section 14.03 due to Borrower's failure to timely commence or complete any Replacements, Repairs, or Restoration, Borrower shall indemnify and hold Lender harmless for, from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arising from or in any way connected with the performance by Lender of the Replacements, Repairs, or Restoration or the investment of the Reserve/Escrow Account Funds; provided that Borrower shall have no indemnity obligation if such actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arise as a result of the willful misconduct or gross negligence of Lender, Lender's agents, employees, or representatives as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**(f)    Amendments to Loan Documents.**

Subject to Section 5.02, Borrower shall execute and deliver to Lender, upon written request, an amendment to this Loan Agreement, the Security Instrument, and any other Loan Document deemed necessary or desirable to perfect Lender's lien upon any portion of the Mortgaged Property for which Reserve/Escrow Account Funds were expended.

**(g)    Administrative Fees and Expenses.**

Borrower shall pay to Lender:

(1)    by the date specified in the applicable invoice, the Repairs Escrow Account Administrative Fee, the Replacement Reserve Account Administration Fee, and the Restoration Reserve Account Administration Fee for Lender's services in administering the Reserve/Escrow Accounts and investing the Reserve/Escrow Account Funds;

(2)    upon demand, a reasonable inspection fee, not exceeding the Maximum Inspection Fee, for each inspection of the Mortgaged Property by Lender in connection with a Repair, Replacement, or Restoration item, plus all other reasonable costs and out-of-pocket expenses relating to such inspections; and

(3)    upon demand, all reasonable fees charged by any engineer, architect, inspector or other person inspecting the Mortgaged Property on behalf of Lender for each inspection of the Mortgaged Property in connection with a Repair, Replacement, or Restoration item, plus all other reasonable costs and out-of-pocket expenses relating to such inspections.

**Section 13.02    Mortgage Loan Administration Matters Regarding Reserves.**

**(a)    Accounts, Deposits, and Disbursements.**

**(1)    Custodial Accounts.**

(A)    The Replacement Reserve Account shall be an interest-bearing account that meets the standards for custodial accounts as required by Lender from time to time. Lender shall not be responsible for any losses resulting from the investment of the Replacement Reserve Deposits or for obtaining any specific level or percentage of earnings on such investment. All interest, if any, earned on the Replacement Reserve Deposits shall be added to and become part of the Replacement Reserve Account; provided, however, if applicable law requires, and so long as no Event of Default has occurred and is continuing under any of the Loan Documents, Lender shall pay to Borrower the interest earned on the Replacement Reserve Account not less frequently than the Replacement Reserve Account Interest Disbursement Frequency.

(B)    Lender shall not be obligated to deposit the Repairs Escrow Deposits or any funds held in the Restoration Reserve Account into an interest-bearing account.

(C)    In no event shall Lender be obligated to disburse funds from any Reserve/Escrow Account if an Event of Default has occurred and is continuing.

**(2)    Disbursements by Lender Only.**

Only Lender or a designated representative of Lender may make disbursements from the Reserve/Escrow Accounts and the Repairs Escrow Account.  Except as provided in Section 13.02(a)(8), disbursements shall only be made upon Borrower request and after satisfaction of all conditions for disbursement.

**(3)    Adjustment to Deposits.**

**(A)    Mortgage Loan Terms Exceeding Ten (10) Years.**

If the Loan Term exceeds ten (10) years (or five (5) years in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms), a property condition assessment shall be ordered by Lender for the Mortgaged Property at the expense of Borrower (which expense may be paid out of the Replacement Reserve Account if excess funds are available).  The property condition assessment shall be performed no earlier than the sixth (6th) month and no later than the ninth (9th) month of the tenth (10th) Loan Year and every tenth (10th) Loan Year thereafter if the Loan Term exceeds twenty (20) years (or the fifth (5th) Loan Year in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms and every fifth (5th) Loan Year thereafter if the Loan Term exceeds ten (10) years).  After review of the property condition assessment, the amount of the Monthly Replacement Reserve Deposit may be adjusted by Lender for the remaining Loan Term by written notice to Borrower so that the Monthly Replacement Reserve Deposits are sufficient to fund the Replacements as and when required and/or the amount to be held in the Repairs Escrow Account may be adjusted by Lender so that the Repairs Escrow Deposit is sufficient to fund the Repairs as and when required.

**(B)    Transfers.**

In connection with any Transfer of the Mortgaged Property, or any Transfer of an ownership interest in Borrower, Guarantor, or Key Principal that requires Lender's consent, Lender may review the amounts on deposit, if any, in the Reserve/Escrow Accounts, the amount of the Monthly Replacement Reserve Deposit and the likely repairs and replacements required by the Mortgaged Property, and the related contingencies which may arise during the remaining Loan Term.  Based upon that review, Lender may require an additional deposit to the

Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, or an increase in the amount of the Monthly Replacement Reserve Deposit as a condition to Lender's consent to such Transfer.

**(4)     Insufficient Funds.**

Lender may, upon thirty (30) days' prior written notice to Borrower, require an additional deposit(s) to the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, or an increase in the amount of the Monthly Replacement Reserve Deposit, if Lender determines that the amounts on deposit in any of the Reserve/Escrow Accounts are not sufficient to cover the costs for Required Repairs, Required Replacements, or the Restoration or, pursuant to the terms of Section 13.02(a)(9), not sufficient to cover the costs for Borrower Requested Repairs, Additional Lender Repairs, Borrower Requested Replacements, or Additional Lender Replacements. Borrower's agreement to complete the Replacements, the Repairs, or the Restoration as required by this Loan Agreement shall not be affected by the insufficiency of any balance in the Reserve/Escrow Accounts.

**(5)     Disbursements for Replacements, Repairs, and Restoration.**

(A)     With respect to Replacements, disbursement requests may only be made after completion of the applicable Replacements and only to reimburse Borrower for the actual approved costs of the Replacements. Lender shall not disburse from the Replacement Reserve Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Replacement Reserve Account shall not be made more frequently than the Maximum Replacement Reserve Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Replacement Reserve Account shall not be less than the Minimum Replacement Reserve Disbursement Amount.

(B)     With respect to Repairs, disbursement requests may only be made after completion of the applicable Repairs and only to reimburse Borrower for the actual cost of the Repairs, up to the Maximum Repair Cost. Lender shall not disburse any amounts which would cause the funds remaining in the Repairs Escrow Account after any disbursement (other than with respect to the final disbursement) to be less than the Maximum Repair Cost of the then-current estimated cost of completing all remaining Repairs. Lender shall not disburse from the Repairs Escrow Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Repairs Escrow Account shall not be made more frequently than the Maximum Repair Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Repairs Escrow Account shall not be less than the Minimum Repairs Disbursement Amount.

(C)     With respect to Restoration, disbursement requests may only be made after completion of the applicable Restoration and only to reimburse Borrower for the actual approved costs of the Restoration. Each disbursement shall be equal to the amount of the actual approved costs of the Restoration items covered by the disbursement request. In addition, Lender shall not disburse any amounts which would cause the funds remaining in the Restoration Reserve Account after any disbursement (other than with respect to the final disbursement) to be less than the then-current estimated cost of completing all remaining Restoration. Lender shall not disburse from the Restoration Reserve Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Restoration Reserve Account shall not be made more frequently than the Maximum Restoration Reserve Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Restoration Reserve Account shall not be less than the Minimum Restoration Reserve Disbursement Amount.

**(6)     Disbursement Requests.**

Borrower must submit a disbursement request in writing for each disbursement from a Reserve/Escrow Account, which disbursement request must specify the items of Replacement, Repairs, or Restoration for which reimbursement is requested (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)), and must:

(A)     if applicable, specify the quantity and price of the items or materials purchased, grouped by type or category;

(B)     if applicable, specify the cost of all contracted labor or other services, including architectural services, involved in the Replacement, Repair, or Restoration for which such request for disbursement is made;

(C)     if applicable, include copies of invoices for all items or materials purchased and all contracted labor or services provided;

(D)     include evidence of payment of such Replacement, Repair, or Restoration satisfactory to Lender (unless Lender has agreed to issue joint checks in connection with a particular Repair, Replacement, or Restoration item as provided in this Loan Agreement);

(E)     if applicable, contain a certification by Borrower that the Repair, Replacement, or Restoration has been completed lien free and in a good and workmanlike manner, in accordance with any plans and specifications previously approved by Lender (if applicable) and in compliance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority having

jurisdiction over the Mortgaged Property, and otherwise in accordance with the provisions of this Loan Agreement; and

(F)    if applicable, include evidence that any certificates of occupancy required by applicable laws or any Governmental Authority have been issued.

**(7)    Conditions to Disbursement.**

In addition to each disbursement request and information required in connection with such disbursement request, Lender may require any or all of the following at the expense of Borrower as a condition to disbursement of Reserve/Escrow Account Funds (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)):

(A)    an inspection by Lender of the Mortgaged Property and the applicable Replacement, Repair, or Restoration item;

(B)    an inspection or certificate of completion by an appropriate independent qualified professional (such as an architect, engineer or property inspector, depending on the nature of the Repair, Replacement, or Restoration) selected by Lender;

(C)    either:

(i)    a search of title to the Mortgaged Property effective to the date of disbursement; or

(ii)    a "date-down" endorsement to Lender's Title Policy (or a new Lender's Title Policy if a "date-down" is not available) extending the effective date of such policy to the date of disbursement, and showing no Liens other than (1) Permitted Encumbrances, (2) liens which Borrower is diligently contesting in good faith that have been bonded off to the satisfaction of Lender, or (3) mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(D)    an acknowledgement of payment, waiver of claims, and release of lien for work performed and materials supplied from each contractor, subcontractor or materialman in accordance with the requirements of applicable law and covering all work performed and materials supplied (including equipment and fixtures) for the Mortgaged Property by that contractor, subcontractor, or materialman through the date covered by the disbursement request (or, in the event that payment to such

contractor, subcontractor, or materialman is to be made by a joint check, the release of lien shall be effective through the date covered by the previous disbursement).

**(8)    Joint Checks for Periodic Disbursements.**

Lender may, upon Borrower's written request, issue joint checks, payable to Borrower and the applicable supplier, materialman, mechanic, contractor, subcontractor, or other similar party, if:

(A)    the cost of the Replacement, Repair, or Restoration item exceeds the Replacement Threshold, the Repair Threshold, or the Restoration Threshold, as applicable, and the contractor performing such Replacement, Repair, or Restoration requires periodic payments pursuant to the terms of the applicable written contract;

(B)    the contract for such Replacement, Repair, or Restoration item requires payment upon completion of the applicable portion of the work;

(C)    Borrower makes the disbursement request after completion of the applicable portion of the work required to be completed under such contract;

(D)    the materials for which the request for disbursement has been made are on site at the Mortgaged Property and are properly secured or installed;

(E)    Lender determines that the remaining funds in the Reserve/Escrow Account are sufficient to pay the cost of the Replacement, Repair, or Restoration item, as applicable, and the then-current estimated cost of completing all remaining Required Replacements, Restoration, or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender;

(F)    each supplier, materialman, mechanic, contractor, subcontractor, or other similar party receiving payments shall have provided, if requested in writing by Lender, a waiver of liens with respect to amounts which have been previously paid to them; and

(G)    all other conditions for disbursement have been satisfied.

**(9)    Replacements and Repairs Other than Required Replacements or Required Repairs.**

**(A)    Borrower Requested Replacements and Borrower Requested Repairs.**

Borrower may submit a disbursement request from the Replacement Reserve Account or the Repairs Escrow Account to reimburse Borrower for any

{01661228.3}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**                           **Form 6001.NR**                                    **Page 69**
Article 13                                         06-19                                  © 2019 Fannie Mae

Borrower Requested Replacement or Borrower Requested Repair. The disbursement request must be in writing and include an explanation for such request. Lender shall make disbursements for Borrower Requested Replacements or Borrower Requested Repairs if:

>          (i)     they are of the type intended to be covered by the Replacement Reserve Account or the Repairs Escrow Account, as applicable;

>          (ii)    the costs are commercially reasonable;

>          (iii)   the amount of funds in the Replacement Reserve Account or Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements or Additional Lender Repairs that have been previously approved by Lender; and

>          (iv)    all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit in connection with any such Borrower Requested Replacements, or an additional deposit to the Repairs Escrow Account for any such Borrower Requested Repairs.

**(B)    Additional Lender Replacements and Additional Lender Repairs.**

Lender may require, as set forth in Section 6.02(b), Section 6.03(c), or otherwise from time to time, upon written notice to Borrower, that Borrower make Additional Lender Replacements or Additional Lender Repairs. Lender shall make disbursements from the Replacement Reserve Account for Additional Lender Replacements or from the Repairs Escrow Account for Additional Lender Repairs, as applicable, if:

>          (i)     the costs are commercially reasonable;

>          (ii)    the amount of funds in the Replacement Reserve Account or the Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower

Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

(iii)    all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit for any such Additional Lender Replacements or an additional deposit to the Repairs Escrow Account for any such Additional Lender Repair.

**(10)    Excess Costs.**

In the event any Replacement, Repair, or Restoration item exceeds the approved cost set forth on either the Required Replacement Schedule for Replacements, the Maximum Repair Cost for Repairs, or the initial cost approved by Lender for Restoration, as applicable, Borrower may submit a disbursement request to reimburse Borrower for such excess cost. The disbursement request must be in writing and include an explanation for such request. Lender shall make disbursements from the applicable Reserve/Escrow Account, if:

(A)    the excess cost is commercially reasonable;

(B)    the amount of funds in the applicable Reserve/Escrow Account is sufficient to pay such excess costs and the then-current estimated cost of completing all remaining Required Replacements, Restoration, or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

(C)    all conditions for disbursement from the applicable Reserve/Escrow Account or the Repairs Escrow Account have been satisfied.

**(11)    Final Disbursements.**

Upon completion and satisfaction of all conditions for disbursements for any Repairs and Restoration, and further provided no Event of Default has occurred and is continuing, Lender shall disburse to Borrower any amounts then remaining in the Repairs Escrow Account or the Restoration Reserve Account, as applicable. Upon payment in full of the Indebtedness and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower any and all amounts then remaining in the Reserve/Escrow Accounts (if not previously released).

**(b)    Approvals of Contracts; Assignment of Claims.**

Lender retains the right to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors, or other parties providing labor or materials in connection with the Replacements, Repairs, or Restoration. Notwithstanding Borrower's assignment (in the Security Instrument) of its rights and claims against all Persons supplying labor or materials in connection with the Replacements, Repairs, or Restoration, Lender will not pursue any such right or claim unless an Event of Default has occurred and is continuing or as otherwise provided in Section 14.03(c).

**(c)    Delays and Workmanship.**

If any work for any Replacement, Repair, or Restoration item has not timely commenced, has not been timely performed in a workmanlike manner, or has not been timely completed in a workmanlike manner, Lender may, without notice to Borrower:

(1)    withhold disbursements from the applicable Reserve/Escrow Account;

(2)    proceed under existing contracts or contract with third parties to make or complete such Replacements, Repairs, or Restoration items;

(3)    apply the funds in the applicable Reserve/Escrow Account toward the labor and materials necessary to make or complete such Replacements, Repairs, or Restoration items, as applicable; or

(4)    exercise any and all other remedies available to Lender under this Loan Agreement or any other Loan Document, including any remedies otherwise available upon an Event of Default pursuant to the terms of Section 14.02.

To facilitate Lender's completion and performance of such Replacements, Repairs, or Restoration items, Lender shall have the right to enter onto the Mortgaged Property and perform any and all work and labor necessary to make or complete the Replacements, Repairs, or Restoration and employ watchmen to protect the Mortgaged Property from damage. All funds so expended by Lender shall be deemed to have been advanced to Borrower, and included as part of the Indebtedness and secured by the Security Instrument and this Loan Agreement.

**(d)    Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

**(e)    No Lender Obligation.**

Nothing in this Loan Agreement shall:

(1)    make Lender responsible for making or completing the Replacements, Repairs, or Restoration;

{01661228.3}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**                          Form 6001.NR                          Page 72
Article 13                                  06-19                          © 2019 Fannie Mae

(2)     require Lender to expend funds, whether from any Reserve/Escrow Account, or otherwise, to make or complete any Replacement, Repair, or Restoration item;

(3)     obligate Lender to proceed with the Replacements, Repairs, or Restoration; or

(4)     obligate Lender to demand from Borrower additional sums to make or complete any Replacement, Repair, or Restoration item.

**(f)     No Lender Warranty.**

Lender's approval of any plans for any Replacement, Repair, or Restoration, release of funds from any Reserve/Escrow Account, inspection of the Mortgaged Property by Lender or its agents, representatives, or designees, or other acknowledgment of completion of any Replacement, Repair, or Restoration in a manner satisfactory to Lender shall not be deemed an acknowledgment or warranty by Lender to any Person that the Replacement, Repair, or Restoration has been completed in accordance with applicable building, zoning, or other codes, ordinances, statutes, laws, regulations, or requirements of any Governmental Authority, such responsibility being at all times exclusively that of Borrower.

# ARTICLE 14 - DEFAULTS/REMEDIES

### Section 14.01     Events of Default.

The occurrence of any one or more of the following in this Section 14.01 shall constitute an Event of Default under this Loan Agreement.

**(a)     Automatic Events of Default.**

Any of the following shall constitute an automatic Event of Default:

(1)     any failure by Borrower to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document;

(2)     any failure by Borrower to maintain the insurance coverage required by any Loan Document;

(3)     any failure by Borrower to comply with the provisions of Section 4.02(d) relating to its single asset status;

(4)     if any warranty, representation, certification, or statement of Borrower or Guarantor in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)     fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, Guarantor, or Key Principal or any of their officers, directors, trustees, partners, members, or managers in connection with:

{01661228.3}

Multifamily Loan and Security Agreement
(Non-Recourse)                          Form 6001.NR                     Page 73
Article 13                              06-19                            © 2019 Fannie Mae

(A)　the application for, or creation of, the Indebtedness;

(B)　any financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)　any request for Lender's consent to any proposed action, including a request for disbursement of Reserve/Escrow Account Funds or Collateral Account Funds;

(6)　the occurrence of any Transfer not permitted by the Loan Documents;

(7)　the occurrence of a Bankruptcy Event;

(8)　the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

(9)　if Borrower, Guarantor, or Key Principal is a trust, or if Control of Borrower, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, the termination or revocation of such trust, except as set forth in Section 11.03(d);

(10)　any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repair Schedule or otherwise required by Lender in writing for such Repair); or

(11)　any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

**(b)　Events of Default Subject to a Specified Cure Period.**

Any of the following shall constitute an Event of Default subject to the cure period set forth in the Loan Documents:

(1)　if Key Principal or Guarantor is a natural person, the death of such individual, unless all requirements of Section 11.03(e) are met;

(2)　the occurrence of a Guarantor Bankruptcy Event, unless requirements of Section 11.03(f) are met;

(3)　any failure by Borrower, Key Principal, or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c); or

(4)     any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document.

**(c)     Events of Default Subject to Extended Cure Period.**

The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:

(1)     any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(a) or Section 14.01(b) above) as and when required.

**Section 14.02     Remedies.**

**(a)     Acceleration; Foreclosure.**

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given). Lender may exercise this option to accelerate regardless of any prior forbearance. In addition, Lender shall have all rights and remedies afforded to Lender hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to Lender at law or in equity (subject to Borrower's statutory rights of reinstatement, if any). Any proceeds of a Foreclosure Event may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

**(b)     Loss of Right to Disbursements from Collateral Accounts.**

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral

{01661228.3}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**                               Form 6001.NR                                    **Page 75**
Article 14                                          06-19                               © 2019 Fannie Mae

**IN WITNESS WHEREOF**, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives. Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

<u>**BORROWER:**</u>

**J&R MULTIFAMILY GROUP, LTD.**, a
Texas limited partnership

By:  **J&R MULTIFAMILY MANAGEMENT, LLC**, a
Texas limited liability company, its General Partner

    By:  **RS INCOME PROPERTIES, LLC**, a
        Texas limited liability company, its Manager

        By: _____ (SEAL)
        Name:  Harry Shani
        Title:  President

    By:  **WEST COAST HOUSTON PROPERTIES LLC.** a
        Texas limited liability company, its Manager

        By: _____ (SEAL)
        Name:  Jaikishin Bhagia
        Title:  Manager

**LENDER:**

**JONES LANG LASALLE MULTIFAMILY, LLC**, a
Delaware limited liability company

By:_____ (SEAL)

Name:        Teresa Goerish

Title:         Closing Coordinator

(schedule 1 redacted)

## SCHEDULE 2
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Summary of Loan Terms
### (Interest Rate Type - Fixed Rate)

| I. | GENERAL PARTY AND MULTIFAMILY PROJECT INFORMATION |
|---|---|
| **Borrower** | **J&R MULTIFAMILY GROUP, LTD.**, a Texas limited partnership |
| **Lender** | **JONES LANG LASALLE MULTIFAMILY, LLC**, a Delaware limited liability company |
| **Key Principal** | **HARRY SHANI** **JAIKISHIN BHAGIA** |
| **Guarantor** | **HARRY SHANI** **JAIKISHIN BHAGIA** |
| **Multifamily Project** | **Worthington at the Beltway** |
| | **ADDRESSES** |
| **Borrower's General Business Address** | 1350 Greens Parkway Houston, Texas 77067 |
| **Borrower's Notice Address** | 1350 Greens Parkway Houston, Texas 77067 Email: rsgeneralpartner@gmail.com |
| **Multifamily Project Address** | 1350 Greens Parkway Houston, Texas 77067 |
| **Multifamily Project County** | Harris |
| **Key Principal's General Business Address** | Harry Shani ▓▓▓▓▓▓▓ Jaikishin Bhagia ▓▓▓▓▓▓▓ |

{01661237.2}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

Page 1
© 2017 Fannie Mae

| | |
|---|---|
| **Key Principal's Notice Address** | Harry Shani<br><br>████████████████<br>████████████████<br><br>Jaikishin Bhagia<br><br>████████████████<br>████████████████ |
| **Guarantor's General Business Address** | Harry Shani<br><br>████████████████<br><br>Jaikishin Bhagia<br><br>████████████████ |
| **Guarantor's Notice Address** | Harry Shani<br><br>████████████████<br>████████████████<br><br>Jaikishin Bhagia<br><br>████████████████ |
| **Lender's General Business Address** | 2177 Youngman Avenue<br>St. Paul, Minnesota 55116<br>Attn: Loan Servicing |
| **Lender's Notice Address** | 2177 Youngman Avenue<br>St. Paul, Minnesota 55116<br>Attn: Loan Servicing<br>Email: loanservicing@am.jll.com |
| **Lender's Payment Address** | 7233 Solution Center<br>Chicago, Illinois 60677-7002 |

| II.    MULTIFAMILY PROJECT INFORMATION | |
|---|---|
| **Property Square Footage** | 525,680 |

{01661237;2}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

Page 2
© 2017 Fannie Mae

| Total Parking Spaces | 482 |
|---|---|
| Total Residential Units | 362 |
| Affordable Housing Property | ☐ Yes<br>☒ No |

| III. | MORTGAGE LOAN INFORMATION |
|---|---|
| Amortization Period | Three hundred sixty (360) months |
| Amortization Type | ☐ Amortizing<br>☐ Full Term Interest Only<br>☒ Partial Interest Only |
| Effective Date | As of May 5, 2020. |
| First Payment Date | The first day of **July, 2020**. |
| First Principal and Interest Payment Date | The first day of **July, 2022**. |
| Fixed Rate | **3.19%** |
| Interest Accrual Method | ☐ 30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months).<br><br>or<br><br>☒ Actual/360 (computed on the basis of a three hundred sixty (360) day year and the actual number of calendar days during the applicable month, calculated by multiplying the unpaid principal balance of the Mortgage Loan by the Interest Rate, dividing the product by three hundred sixty (360), and multiplying the quotient obtained by the actual number of days elapsed in the applicable month). |

{01661237;2}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

Page 3
© 2017 Fannie Mae

| Interest Only Term | Twenty-four (24) months |
|---|---|
| Interest Rate | The Fixed Rate |
| Interest Rate Type | Fixed Rate |
| Last Interest Only Payment Date | The first day of **June, 2022**. |
| Loan Amount | **$16,724,000.00** |
| Loan Term | One hundred forty-four (144) months |
| Loan Year | The period beginning on the Effective Date and ending on the last day of **May, 2021**, and each successive twelve (12) month period thereafter. |
| Maturity Date | The first day of **June, 2032**, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |
| Monthly Debt Service Payment | (i)   $44,457.97 for the First Payment Date; <br><br> (ii)   for each Payment Date thereafter through and including the Last Interest Only Payment Date: <br><br> (a)   $41,494.10 if the prior month was a 28-day month; <br><br> (b)   $42,976.03 if the prior month was a 29-day month; <br><br> (c)   $44,457.97 if the prior month was a 30-day month; and <br><br> (d)   $45,939.90 if the prior month was a 31-day month; and <br><br> (iii)   $72,234.32 for the First Principal and Interest Payment Date and each Payment Date thereafter until the Mortgage Loan is fully |

{01661237.2}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

**Page 4**
© 2017 Fannie Mae

| | |
|---|---|
| | paid. |
| **Prepayment Lockout Period** | The zero (0) Loan Year of the term of the Mortgage Loan. |

| IV. | YIELD MAINTENANCE/PREPAYMENT PREMIUM INFORMATION |
|---|---|
| **Yield Maintenance Period End Date**<br><br>*or*<br><br>**Prepayment Premium Period End Date** | The last day of **November, 2031**. |
| **Yield Maintenance Period Term**<br><br>*or*<br><br>**Prepayment Premium Period Term** | One hundred thirty-eight (138) months |

| V. | RESERVE INFORMATION |
|---|---|
| **Completion Period** | Within *twelve (12)* months after the Effective Date or as otherwise shown on the Required Repair Schedule. |
| **Initial Replacement Reserve Deposit** | $0.00 |
| **Maximum Inspection Fee** | $500.00 |
| **Maximum Repair Disbursement Interval** | One (1) time per calendar month |
| **Maximum Replacement Reserve Disbursement Interval** | One (1) time per calendar quarter |
| **Minimum Repairs Disbursement Amount** | $5,000.00 |

{01661237.2}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate)**
**Fannie Mae**

Form 6102.FR
12-17

Page 5
© 2017 Fannie Mae

| | |
|---|---|
| **Minimum Replacement Reserve Disbursement Amount** | $5,000.00 |
| **Monthly Replacement Reserve Deposit** | $9,050.00 |
| **Repair Threshold** | $10,000.00 |
| **Repairs Escrow Account Administrative Fee** | $0.00 |
| **Repairs Escrow Deposit** | $53,275.00 (Immediate Repairs)<br><br>$1,346,725.00 (Discretionary Capital Expenditure)<br><br>$1,400,000.00 (Total Repair Amount) |
| **Replacement Reserve Account Administration Fee** | $0.00 |
| **Replacement Reserve Account Interest Disbursement Frequency** | Annually |
| **Replacement Threshold** | $10,000.00 |

{01661237;2}
**Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
Fannie Mae**

**Form 6102.FR
12-17**

**Page 6
© 2017 Fannie Mae**

# (schedules 3-8 and Exhibit A to Loan Agreement redacted)



November 14, 2025

Via EMAIL: rsgeneralpartner@gmail.com; jbhagia@yahoo.com; shaniharry@gmail.com
Via Overnight Courier

J&R Multifamily Group, LTD. ("Borrower")
1350 Greens Parkway
Houston, TX 77067
Attention: Harry Shani & Jaikishin Bhagia

Re:   **NOTICE OF DEMAND (the "Notice")**
Property Name: Worthington at the Beltway
Property Address: 1350 Greens Parkway, Houston, Texas 77067
Loan Number: 48660 (the "Loan")

Multifamily Note (the "Note") dated as of May 5, 2020 in the original principal amount of $16,724,000.00, made by Borrower, payable to the order of Jones Lang LaSalle Multifamily, LLC, (JLL REC, LLC) ("Original Lender"), which Note is secured by, inter alia, certain real property more particularly described in the Multifamily Mortgage, Assignment of Rents and Security Agreement dated as of even date therewith (the "Security Instrument") and Multifamily Loan and Security Agreement dated as of even date therewith (the "Loan Agreement"), which Note, Security Instrument, and Loan Agreement, together with other loan documents (such Note, Security Instrument and Loan Agreement and other loan documents hereafter referred to as the "Loan Documents") were assigned by the Original Lender to Fannie Mae ("Fannie Mae"), and all of which cover certain real and personal property located at the address set forth above and more particularly described in the Security Instrument (the "Mortgaged Property" or the "Property"). Original Lender is now the servicer of the Loan and may be referred to herein as "Servicer."

Dear Borrower,

Notice is hereby given that Borrower has failed to maintain the Mortgaged Property in accordance with the terms of the Loan Documents, including, but not limited to, Article 6 of the Loan Agreement, which failure to maintain may constitute an Event of Default under the Loan Documents. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Documents.

On September 29, 2025, a Property Condition Assessment ("PCA") was conducted on the Mortgaged Property, whereby certain deficiencies were noted and identified. Enclosed herewith is a copy of the PCA and a schedule of needed repairs and replacements is attached hereto as Exhibit A.

**JLL Real Estate Capital, LLC**
Loan Servicing
4200 Westheimer Rd, Ste. 1400
Houston, Texas 77027

**T**  +1 713 852 3488
**E**  Fernando.Salazar@jll.com
**W**  jll.com

**EXHIBIT**
**A-2**

The PCA contains specific information related to the current deficiencies in physical condition of the Mortgaged Property and should be reviewed by Borrower for more detail on the required repairs. All repairs and replacements identified on Exhibit A and in the PCA shall constitute Additional Lender Repairs and Additional Lender Replacements, as defined in the Loan Documents. Please note, however, this may not be an exhaustive list and is subject to change pursuant to additional inspections that may be performed or required by Fannie Mae or Servicer.

Demand is hereby made for Borrower to correct its failure to maintain the Mortgaged Property and immediately implement corrective action to undertake repairs and replacements of the deficiencies noted in the PCA and on Exhibit A, as well as any other repair or replacement needed at the Mortgaged Property, to the satisfaction of Fannie Mae in its sole discretion. Borrower must also perform the Additional Lender Repairs and Additional Lender Replacements within the dates listed on Exhibit A. Furthermore, Borrower must provide Fannie Mae or Servicer access, at such time and date requested by either, for inspection of the Mortgaged Property to determine the status of the required Additional Lender Repairs and Additional Lender Replacements to confirm that such repairs and replacements have been completed to Fannie Mae's satisfaction, in its sole discretion.

Pursuant to Section 13.02(a)(4) of the Loan Agreement, Fannie Mae has determined the funds in the Replacement Reserve Account or the Repairs Escrow Account are insufficient to cover the costs of the Additional Lender Repairs and Additional Lender Replacements. Demand is further made for Borrower to deposit with Servicer, for the benefit of Fannie Mae, within thirty (30) days of the date of this letter an amount equal to $862,000.00, which deposit will be held by Servicer as additional security for the Loan. Failure to deposit the required amount shall constitute Borrower's failure to pay an amount due on the Loan and will be an Event of Default under the Loan Documents.

Additionally, Fannie Mae and Servicer have determined the amount of funds in the Replacement Reserve Account and Repairs Escrow Account are insufficient to cover the on-going Required Repairs and Required Replacements identified in the PCA, even after completion of the Additional Lender Repairs and Additional Lender Replacements identified on Exhibit A. To ensure the necessary funds are available, Fannie Mae hereby notifies Borrower the Monthly Replacement Reserve Deposit is being increased by $3,227.83 per month so that the total Monthly Replacement Reserve Deposit by Borrower shall be equal to $12,277.83 per month. This increased deposit amount will commence with the payment due on January 1, 2026.

Each of the above constitutes separate obligations of Borrower under the Loan Documents and Borrower's failure to perform any of the above obligations may constitute a separate Event of Default under the Loan Documents.

The Servicer's or Fannie Mae's acceptance of any payment on the Loan should not be considered a waiver of any Event of Default or a novation, modification, or renewal of the Loan. Notwithstanding the acceptance of any payments or any other amounts at any time by the Servicer, Fannie Mae does not waive any Event of Default which may exist under the Loan Documents. Furthermore, acceptance of any payment shall not act as a waiver of, or prevent Fannie Mae from, exercising any right, remedy, or power available to Fannie Mae, including, without limitation, all rights, remedies, and powers granted under the Loan Documents and/or at law or in equity, all of which are expressly reserved.

Sincerely,

*Fernando Salazar*

Fernando Salazar
Senior Director


cc:    Brian Crain, Fannie Mae

Harry Shani
5711 Hillcroft, Suite D1
Houston, Texas 77036

Jaikishin Bhagia
13621 Bay Front Drive
Houston, Texas 77077

Enclosures (PCA copy)

# JLL

## EXHIBIT A

| Life Safety: Items that may impact the health or safety of residents, employees or visitors | | | | | | |
|---|---|---|---|---|---|---|
| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description | Section Reference |
| Balcony repair | 362 | EA | $750.00 | $271,500.00 | Balconies range from minor issues including warped planks and weathering. Major issues observed were areas of fire damage and areas of missing wood due to rot. Several balconies were covered with plywood or vinyl. An allowance cost for repairs is included. | 3.2.6 |
| Upper walkway Fasteners repair | 12 | EA | $1,000.00 | $12,000.00 | A large amount of balconies has loose railing attachment hardware, which is a life safety issue. Due to the varying level of issues, railing hardware issues and the hidden issues by the many coverings, the balconies and all hardware for the railing should be inspected and repaired as needed. | 3.2.6 |
| GFCI Outlet Installation | 300 | EA | $75.00 | $22,500.00 | GFCI outlets were not observed in all appropriate locations. The majority of units observed did not have GFCI outlets in the kitchens or bathrooms. These should be added immediately as a life safety issue. | 3.3.5 |
| Label subpanels | 362 | EA | $50.00 | $18,100.00 | The majority of sub breaker panels were not labeled. An allowance cost is included. | 3.3.5 |
| **Subtotal: Life Safety** | | | | $324,100 | | |

| Critical Repair: Items recommended for completion within the next six months. | | | | | | |
|---|---|---|---|---|---|---|
| Vegetation and tree trimming | 1 | Allow | $7,500.00 | $7,500.00 | Several trees and vegetation were in contact with the buildings. The trees and vegetation should be trimmed back. This requires immediate correction and repair. | 3.1.3 |
| Repair site steps | 1 | Allow | $1,500.00 | $1,500.00 | The site stairs near the security gate and building 3 are cracked and settled. Repair to the stairs as a trip hazard is recommended. | 3.1.3 |
| Erosion control | 1 | Allow | $15,000.00 | $15,000.00 | Erosion was observed throughout the site at building foundations, mechanical pads and sidewalks. Rerouting of the water drainage to prevent the erosion and replacing the missing ground cover is recommended. | 3.1.3 |
| Concrete Pavement Repairs/ Replacements | 1 | Allow | $10,000.00 | $10,000.00 | Areas of spalling and deterioration needs to be repaired. | 3.1.6 |
| Concrete Pavement Striping | 482 | EA | $10.00 | $4,820.00 | The concrete pavement will require restriping after repairs. | 3.1.6 |
| Curbing, Concrete repairs | 400 | LF | $9.00 | $3,600.00 | Curb cracking was observed throughout the Property. The location and severity of this cracking poses a tripping hazard. These areas should be repaired immediately. | 3.1.6 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Sidewalk, Repair Trip Hazards | 19 | EA | $500.00 | $9,500.00 | The sidewalks are in generally good condition, but there are limited locations of tripping hazards observed near units 203, 903, 315, 910, 1209, 1016, 1005, 812, 1219, 909, 904, 1021, 801, 514, near the laundry room near Building 7 and the corner of Building 8. These should be repaired immediately. | 3.1.6 |
| Fencing Repair | 1 | Allow | $5,500.00 | $5,500.00 | The gateway to the playground area is crushed in the upper portion. The wood fencing at the center of the parking area near building 2 has leaning and damaged areas. The gate located on the west side of the property was damaged and secured by a chain. In order to preserve site security and grade retention, these sections should be repaired in the immediate term. | 3.1.8 |
| Building 11 repairs | 1 | Allow | $30,000.00 | $30,000.00 | Building 11 has missing bricks in the facade and diagonal cracking in the bricks at the third floor. Damaged and missing wood siding was observed along the roof within the area. The third floor upper walkway near unit 1109 also has cracking and dislocation. Unit 1216 is on the second floor is down due to a large area of sub floor concrete damage in the living room. Unit 804 has a large bulge in the ceiling. According to the management, the unit above had a large sub floor repair due to deteriorated plywood under the concrete layer. | 3.2.3 |
| Wood Siding Repairs | 11 | EA | $6,000.00 | $66,000.00 | The facades were noted to be in generally fair condition. Nova observed areas of wood rot at the T-11 siding throughout the site. Areas of wood siding with wood rot were located along the rooftop areas, soffits and at the building fascia. Repair costs to building 11 is included above. | 3.2.4 |
| Paint/Caulk - Cladding | 362 | Unit | $200.00 | $72,400.00 | Peeling and faded paint was observed at the wood siding and metal components. Repainting and re-caulking is recommended to prevent further deterioration. | 3.2.4 |
| Roof Replacement - Asphalt Shingles/ gutters | 120,000 | SF | $3.50 | $420,000.00 | The roofs have patching throughout the buildings. Several areas of water damage ranging from minor to severe were observed. Building 10 has an area of roof sub framing collapsing over unit 1024 and a roof depression was observed over the laundry room near Building 7. Damaged/missing gutters should also be replaced as needed. | 3.2.5 |
| Stair Repairs | 1 | EA | $5,000.00 | $5,000.00 | The stairs near unit 101 has dislocated support bars. The stair risers near unit 410 have severe rust. The stairs near unit 842 has a damaged concrete step. The stair structure near unit 720 has a wood beam with severe wood rot. Repair of the steps is recommended. | 3.2.6 |
| Window Replacements | 6 | EA | $600.00 | $3,600.00 | Broken windows were observed at units 834, 222, 209, 1225, at one window at Building 3 and 6. Replacement of the windows with plexiglass is recommended for security and energy efficiency now and during the term. | 3.2.7 |
| Carport Repair | 1 | Allow | $5,000.00 | $5,000.00 | The carports exhibit impact damage to the roofs throughout the site. The carport near Building 2 is severely leaning and has damage to the center posts and the concrete supporting all the posts are cracked. | 3.2.8 |
| Spa heater | 1 | EA | $1,800.00 | $1,800.00 | The spa heater is disconnected and non operable. Repair of the spa equipment is recommended. | 3.2.8 |
| Spa wood surround paint | 1 | EA | $500.00 | $500.00 | Peeling paint noted at the spa wood surround should be repainted. | 3.2.8 |
| Renovate down units | 4 | EA | $7,000.00 | $28,000.00 | Unit 1141, 1229, 1217 and 320 are considered down units. Unit 1229 is considered down due to sheet rock damage. Unit 1217 is down due to the concrete flooring being damaged in the living room. Unit 320 is down due to drywall damage. Unit 1141 is missing the entire ceiling in a bedroom. | 3.4.3 |
| Stained ceiling repairs | 9 | EA | $1,000.00 | $9,000.00 | Stained ceilings at the locations of reported historic leak repairs. Several stains, water damage and minor mold were observed on the ceilings of units 209, 1228, 1216, 914, 1142, 1230, 913, 1109 and 831. The ceilings should be cleaned, sealed and repainted. | 4.1 |
| ADA item | 1 | EA | $1,100.00 | $1,100.00 | Access to the leasing office requires the navigation of a flight of steps, and as such it is not considered handicap-accessible. Install a resident call button and designated van space/aisle. | 5.9.3.1 |

| Subtotal: Critical Repair | $699,820 | |
|---|---|---|

| Deferred Maintenance: Non-recurring capital items typically recommended for completion within 12 months. | | |
|---|---|---|
| Subtotal: Deferred Maintenance | | |

| Total Immediate Repairs | $1,023,920 | |
|---|---|---|

# JEB BROWN
## Attorney at Law

December 31, 2025

JLL Real Estate Capital, LLC
Attn: Fernando Salazar, Senior Director
4200 Westheimer Road, Suite 1400
Houston, Texas 77027
Via Email:  Fernando.Salazar@jll.com

<div style="margin-left:2em">

RE:    Property Name: Worthington at the Beltway
Property Address: 1350 Greens Parkway, Houston, Texas 77067
Loan Number: 48660 (the "Loan")

Multifamily Note (the "Note") dated as of May 5, 2020 in the original principal amount of $16,724,000.00, made by Borrower, payable to the order of Jones Lang LaSalle Multifamily, LLC, (JLL REC, LLC) ("Original Lender"), which Note is secured by, inter alia, certain real property more particularly described in the Multifamily Mortgage, Assignment of Rents and Security Agreement dated as of even date therewith (the "Security Instrument") and Multifamily Loan and Security Agreement dated as of even date therewith (the "Loan Agreement"), which Note, Security Instrument, and Loan Agreement, together with other loan documents (such Note, Security Instrument and Loan Agreement and other loan documents hereafter referred to as the "Loan Documents") were assigned by the Original Lender to Fannie Mae ("Fannie Mae"), and all of which cover certain real and personal property located at the address set forth above and more particularly described in the Security Instrument (the "Mortgaged Property" or the "Property"). Original Lender is now the servicer of the Loan and may be referred to herein as "Servicer."

</div>

Dear Mr. Salazar:

This letter is written on behalf of J&R Multifamily Group, Ltd., the Borrower under the above-referenced Loan Agreement. We are following up on our prior correspondence relating to JLL's demand to Borrower to deposit the sum of $862,000.00 with Servicer.

JLL previously secured a Multifamily Property Condition Assessment Report prepared by Nova Group and dated October 6, 2025 (the "Nova PCR"). As noted in our prior correspondence, certain items in the Nova PCR appeared to be incorrect or overstated.

As discussed in the prior letter to JLL, Borrower engaged Property Condition Assessment Consultants, Inc. ("PCAC") to perform a separate property condition report. The PCAC report was completed on December 19, 2025 and accompanies this letter.

There are some specific items identified in the PCAC report which merit attention and further discussion, as follows:

> **EXHIBIT**
> **A-3**

I.    Roof Replacement Findings:

The Nova PCR concluded that 100% of the roofs on the buildings at the Property require full replacement. This conclusion is inaccurate and unsupported by observable conditions. The PCAC report determined that only the roofs on buildings 8, 10, and 11 require replacement, while the remaining buildings' roofs are serviceable and do not present life-safety concerns or imminent failure. The PCAC report is supported by their physical inspection, remaining useful life analysis, and photographic documentation, and is a more accurate description of the needs of the Property. The PCAC report's estimate of the cost to perform roof replacements and related repairs is $182,000.00. While the PCAC report notes that all roofs will eventually require replacement due to their age, requiring immediate replacement of the entirety of the roofs is not supported by the report's findings.

II.    Balcony Repair Findings.

Section 2 of the Nova PCR recommends replacement of balconies on all 362 units. That assumption is factually incorrect. **Over 100 units have no balcony at all**. The PCAC report confirms that only some of the balconies require repair or replacement of their wood plank flooring, while the majority are structurally sound and require no corrective work. The fact that the Nova PCR recommended replacement of balconies for all 362 units indicates that Nova may not have visually inspected the exterior of all the units. On the contrary, the PCAC report was based on a physical inspection of all the units thus resulting in a more accurate evaluation. The PCAC report's estimate of the cost to perform repairs to the balconies is $72,000.00.

III.    Other Repair Items.

The PCAC report also noted certain recommended repairs to (i) concrete pavement and curbs in an estimated amount of $23,000.00; (ii) repair and replacement of building siding in certain locations in an estimated amount of $181,000.00; and (iii) repairs to down units in the estimated amount of $48,000.00.

The PCAC report concluded that the total estimated amount of needed repairs is $506,000.00 with none of the identified items being considered "critical".

As noted in prior correspondence, the Borrower respectfully submits that the scope and amounts of the repairs identified in the Nova PCR is significantly overstated, resulting in an excessive repair escrow requirement. In light of the findings in the PCAC report, the Borrower requests that the Lender work with the Borrower to:

1.    Reconcile the Nova PCR findings with the PCAC report.

2.    Adjust the roof replacement scope to Buildings 8, 10, and 11 only, consistent with the recommendations in the PCAC report.

3.    Revise the balcony repair quantities to reflect only those balconies requiring repair as identified in the PCAC report.

4.      Recalculate any proposed repair escrow based on verified, supportable scope set forth in the PCAC report.

5.      Suspend any enforcement actions or notices of default until the above items are resolved.

As noted previously, we believe an on-site meeting and inspection would be appropriate, including representatives of Borrower, Servicer, Nova, and PCAC, to develop a realistic and accurate scope of work as well as a realistic time frame in which to complete the same. While this effort is pending, Borrower also requests that the demand for the deposit of $862,000.00 be deferred, as the PCAC report findings justify a reduced required repair number.

Borrower is committed to maintaining the Property in a competent and professional manner, and is committed to compliance with the terms of the Loan Documents. Borrower desires to have a cooperative relationship with Lender and Servicer in an effort to bring this matter to a satisfactory resolution.

Should you have any questions, please feel free to contact me.

Sincerely,

JEB BROWN



**Driving progress**
**through partnership**
**Devan J. Dal Col**
Direct Phone:  +1 469 816 9302
Email:  ddalcol@reedsmith.com

Reed Smith LLP
2850 N. Harwood Street
Suite 1500
Dallas, TX  75201
reedsmith.com

March 2, 2026

**NOTICE OF DEFAULT AND ACCELERATION**

**By Certified Mail, Return Receipt Requested, and by email**

J&R Multifamily Group, Ltd.
1350 Greens Parkway
Houston, Texas 77067
Email: rsgeneralpartner@gmail.com

Harry Shani
5711 Hillcroft, Suite Dl
Houston, Texas 77036
Email: shaniharry@gmail.com

Jaikishin Bhagia
13621 Bay Front Drive
Houston, Texas 77077-1996
Email: jbhagia@yahoo.com

Re:    $16,724,000.00 loan made on or about May 5, 2020, by JONES LANG LASALLE MULTIFAMILY, LLC, a Delaware limited liability company ("*Original Lender*"), to J&R Multifamily Group, Ltd., a Texas limited partnership ("*Borrower*") and evidenced by, without limitation, (i) that certain Multifamily Note dated May 5, 2020, in the stated principal amount of $16,724,000.00 made by Borrower to the order of Original Lender (the "*Note*"); (ii) that certain Multifamily Loan and Security Agreement dated May 5, 2020, between Borrower and Original Lender (the "*Loan Agreement*"); (iii) that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated May 5, 2020, executed by Borrower for the benefit of Original Lender (the "*Security Instrument*"), as assigned by Original Lender to Fannie Mae pursuant to that certain Assignment of Security Instrument ("*Assignment*") effective May 5, 2020; and (iv) that certain Guaranty of Non-Recourse Obligations, dated May 5, 2020 (the "*Guaranty*"), executed by Harry Shani and Jaikishin Bhagia (together, "*Guarantor*") for the benefit of Original Lender.

For purposes of this letter, the loan identified above or by reference shall be called the "*Loan*," all agreements and documents identified above or by reference evidencing such Loan, including any and all amendments and supplements thereto, shall collectively be called the "*Loan Documents*," and all real and personal property or properties securing the Loan are, collectively, the "*Property*."

<div style="border:1px solid black; display:inline-block; padding:4px; text-align:center;">

**EXHIBIT**

**A-4**

</div>

J&R Multifamily Group, Ltd., *et al.*
March 2, 2026
Page 2

ReedSmith

Dear Borrower and Guarantors:

This firm represents Fannie Mae. Fannie Mae has purchased the Loan from Original Lender. The Loan is serviced by Original Lender (the "***Servicer***"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Loan Documents.

Borrower is in default under the terms of the Loan Documents. On September 29, 2025, a Property Condition Assessment ("***PCA***") was conducted on the Property, whereby certain deficiencies were noted and identified. On November 14, 2025, Servicer sent Borrower a Notice of Demand ("***Demand Letter***") and demanded (1) that Borrower correct its failure to maintain the Mortgaged Property and immediately implement corrective action to undertake repairs of the deficiencies noted in the PCA, (2) deposit with Servicer, on behalf of Fannie Mae, within thirty (30) days of the Demand Letter an amount equal to $862,000.00 and (3) increase the Monthly Replacement Reserve Deposit by $3,227.83 per month beginning January 1, 2026.

Borrower has failed to comply with the Demand Letter. Such failure constitutes an Event of Default under the Loan Documents. Pursuant to Section 14.01(a)(10) of the Loan Agreement, failure to provide satisfactory evidence of the completion of all or certain required Repairs within the time periods specified constitutes an Event of Default. Further, failure to deposit the amounts requested in the Demand Letter constitutes an automatic Event of Default pursuant to Section 14.01(a)(1) of the Loan Agreement.

This letter constitutes a formal notice that the outstanding principal indebtedness evidenced by the Note **has been accelerated** as a result of the occurrence and present continuation of such Events of Default. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae. In order to determine the exact payoff figure currently owing to Fannie Mae pursuant to the Note, you may contact me or have your counsel contact me at the direct dial telephone number set forth above. As a result, any monthly payment or payments tendered by Borrower after the initial date of default constitute only a partial payment of Borrower's outstanding indebtedness. Notwithstanding the acceptance, application, and/or receipt of any partial payments at any time by Fannie Mae, the Note remains in default, and Fannie Mae does not hereby waive any defaults which previously existed or may exist under the Loan Documents. Acceptance, application, and/or receipt of the partial payment(s) does not imply that any future partial payments will be accepted or applied by Fannie Mae and shall not be deemed a waiver of Fannie Mae's right to reject partial payments, assess late charges, charge a default rate of interest, nor prevent Fannie Mae from exercising any right, remedy, or power available to Fannie Mae, including, without limitation, all rights, remedies, and powers granted under the Note and any related Loan Documents and at law or in equity. This written notice is being transmitted as a courtesy to Borrower (and Guarantor) and is not intended as an admission that any written notice is otherwise due Borrower (or Guarantor).

You are further notified that, by reason of such default and acceleration of said indebtedness, Fannie Mae may immediately institute foreclosure proceedings under the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity (including, without limitation, the appointment of a receiver over the Property, applications of escrow deposits, reserves, and/or other funds held by Servicer toward payment of Borrower's obligations under the Loan Documents in the manner set forth therein).

J&R Multifamily Group, Ltd., *et al.*
March 2, 2026
Page 3



Please be advised that the demand made hereby is being given as a courtesy, and not because it is required pursuant to the terms and provisions of the Loan Documents. By making this demand, Fannie Mae does not waive any of the rights or remedies available to Fannie Mae under the Loan Documents or otherwise. No failure to exercise any rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Further, any reference by Fannie Mae or Servicer to any event of default or default shall in no way constitute or be construed to be, a waiver of any other event of default or default which may now exist or hereafter arise under the Loan Documents.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED AFTER THE OCCURRENCE OF THE EVENT OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

The only agreements that continue to exist between Fannie Mae and you are those set forth in the Loan Documents, which may only be amended by agreement of the parties in writing. Please be advised that any discussions that may have occurred or may occur in the future between representatives of You and of Fannie Mae regarding the Property or the Note evidence nothing more than the continuing good faith attempts of Fannie Mae to work out the existing problems in a manner reasonably acceptable to all parties. You may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be fully enforceable under the terms of the Loan Documents.

Notwithstanding any previous action or inaction by or on behalf of Servicer or Fannie Mae to the contrary, if any, you are hereby notified that Fannie Mae will require strict compliance with the terms and conditions of the Note and other Loan Documents, and Fannie Mae does not in any manner waive any rights or remedies available against you pursuant to the Note or other Loan Documents or applicable law, including without limitation the rights described in this letter.

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and information purposes only, and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)(11), if applicable. In addition, all of Fannie Mae's claims, demands and accruals with respect to the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

J&R Multifamily Group, Ltd., *et al.*
March 2, 2026
Page 4



Please be advised that this letter is also being sent to Guarantor and Key Principal to notify each of them of Borrower's defaults. Fannie Mae, at its sole option and in addition to any other remedies available to Fannie Mae, may seek to recover from Guarantor any indebtedness and other obligations owing from Guarantor pursuant to the Guaranty or the other Loan Documents. Fannie Mae does not waive any other rights and/or remedies under the Loan documents, all of which are expressly reserved.  If you wish to discuss this matter further, you may contact me.

Your immediate attention to this matter is recommended.

Sincerely,

*/s/ Devan J. Dal Col*
Devan J. Dal Col


Cc:              Keith Aurzada (of the firm)
                 Jay Krystinik (of the firm)
                 Matt Trent (Fannie Mae)
                 Jones Lang Lasalle Multifamily, LLC (Servicer)

# CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.

### ATTORNEYS AT LAW

LINCOLN CHEN
SHAREHOLDER
DIRECT: 713.654.9690
LINCOLN.CHEN@CHAMBERLAINLAW.COM

1200 SMITH STREET, SUITE 1400
HOUSTON, TEXAS 77002
713.658.1818      800.342.5829
FAX: 713.658.2553

HOUSTON
ATLANTA
PHILADELPHIA
SAN ANTONIO

March 18, 2026

Via email: ddalcol@reedsmith.com
Devan J. Dal Col
REED SMITH LLP
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201

> RE:   Responses to November 14, 2025 Notice of Demand, March 2, 2026 Notice of
> Default and Acceleration, and March 12, 2026 Pre-Negotiation Letter

Counsel,

As you know, our firm represents J&R Multifamily Group, Ltd. ("Borrower") in connection with the May 5, 2020 Multifamily Security and Loan Agreement (Non-Recourse) between Jones Lang Lasalle ("Servicer") and Borrower (the "Loan Agreement"), which was purchased from Servicer by your client, Fannie Mae ("Lender").

Thank you for your March 12, 2026 letter on behalf of the Lender, whereby Lender expressed its interest and willingness to participate in a meeting among Borrower, Servicer, and Lender regarding the Loan. To be clear, Borrower does not seek to restructure the Loan but rather to discuss a path forward consistent with its history of timely payments and continued commitment to maintaining the collateral in good condition.

### *Preliminary Questions*

As an initial matter, Borrower made a loan payment on March 6, 2026 pursuant to the Loan Agreement. However, that amount was subsequently credited back to Borrower's account on March 12, 2026, which coincidentally was the same day that we spoke over the phone.

It is not clear to us whether the decision to credit back this amount was made before or after we spoke. However, as Borrower has never missed a loan payment, we request a clear explanation from the Lender as to why the payment was rejected and refunded, and confirmation that this will not constitute a payment default or result in additional adverse action from the Lender.  It is Borrower's intention to continue to service this debt.

Additionally, Special Servicer CWCapital Asset Management LLC recently requested an inspection. We would like clarity from the Lender as to the basis and scope of this request, and whether it is being made in the ordinary course of servicing or in connection with a potential transfer to special servicing or other enforcement action, and if so, the basis for same.

EXHIBIT
A-5

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 2

### Borrower's Commitment to Good Faith Negotiations

Borrower is interested in amicably resolving the current dispute,  and as a sign of good faith, will agree to the following, described more particularly in the revised Pre-Negotiation Agreement, attached hereto as Exhibit A: (1) Fannie Mae's rights and remedies shall not be affected or impaired by entering into discussions with Borrower; (2) any oral discussions will not modify the Loan documents; (3) Borrower will produce most the requested documentation; and (4) Borrower will top-up the reserve accounts to the amount  referenced in the December 19, 2025 PCA by Property Condition Assessment Consultants, Inc. ($506,000) in lieu of remitting net operating income from the Property to Servicer.

However, Borrower cannot in good conscience acknowledge it is in default under the Loan Documents and will not under any circumstance waive and release its rights and defenses[1] against Lender, because **Borrower is not in default under the Loan Agreement**.

### Lender's Claim for Default is Unfounded

In Lender's March 2, 2026 letter to Borrower, Lender improperly claims Borrower is in default based on the following:

- "On September 29, 2025, a Property Condition Assessment ('PCA') was conducted on the Property, whereby certain deficiencies were noted and identified."

- "On November 14, 2025, Servicer… demanded: (1) that Borrower… immediately implement corrective action to undertake repairs of the deficiencies noted in the PCA, (2) deposit with Servicer… an amount equal to $862,000, and (3) increase the Monthly Replacement Reserve Deposit by $3,227.83 per month beginning January 1, 2026.

- "Borrower failed to comply with the Demand Letter" and "[s]uch failure constitutes an Event of Default…" because "failure to provide satisfactory evidence of the completion of all certain required Repairs with the time periods specified" and "failure to deposit the amounts requested… constitutes an automatic Event of Default pursuant to Section 14.01.(a)(1) of the Loan Agreement."

While Section 14.01(a)(1) provides that "any failure by Borrower to pay or deposit when due any amount required… by the Loan Agreement" would constitute an Event of Default, Lender cannot claim an Event of Default if Borrower was not required to deposit funds.

---

[1] Notably, any agreement whereby, (1) one party waives claims and defenses in exchange for the counterparty's "willingness to engage in discussions about a possible resolution," and (2) that same counterparty can unilaterally terminate discussions at any time, and "waivers and release of claims and defenses… survive such termination" would be rendered void as an illusory contract for failure of consideration. In other words, even if Borrower agreed to Lender's proposed Pre-Negotiation terms, Lender would not be able to enforce those terms under Texas law.

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 3

In its November 14, 2025 letter, Servicer described the basis for its demand that Borrower deposit funds as follows:

> [Lender's] PCA contains specific information related to current deficiencies in the physical conditions of the Mortgaged Properties and should be reviewed by Borrower for more detail on the required repairs. All repairs and Replacements identified on Exhibit A and in the PCA **shall constitute Additional Lender Repairs and Additional Lender Replacements, as defined in the Loan Documents**…

Thereafter, Servicer cited Section 13.02(a)(4) to demand that Borrower (1) deposit $862,000 with Servicer and (2) pay the increased Monthly Replacement Reserve Deposit of $3,227.83 per month starting January 1, 2026.

Section 13.02(a)(4) provides that "Lender may… require an additional deposit(s) to the Replacement Reserve Account, the Repair Escrow Account or the Restoration Reserve Account, or increase the amount of the Monthly Replacement Reserve Deposit, if Lender determines that the amount on deposit in any Reserve/Escrow Accounts are not sufficient to cover the costs of… Additional Lender Repairs… or Additional Lender Replacements."

Additional Lender Repairs and Additional Lender Replacements are defined terms in the Loan Agreement to mean: "[repairs or replacements] of the type listed on the Required [Repair or Replacement] Schedule… that are determined advisable by Lender **to keep the Mortgaged Property in good order and repair** (ordinary wear and tear excepted) and in good marketable condition **or to prevent deterioration** of the Mortgaged Property."

The alleged repairs and replacements identified on Lender's September 29, 2025 PCA ostensibly **<u>do not meet the definition of Additional Lender Repairs and Additional Lender Replacements</u>**.

### Lender's PCA is Replete with Errors
### *Including Demands to Repair Structures and Portions of the Property that Do Not Exist*

Just as Servicer suggested in its November 14, 2025 letter, Borrower reviewed Lender's PCA and identified material errors, including mistakes as egregious as its suggestion that Borrower should repair and replace 100 balconies that neither exist nor have ever existed on the Mortgaged Property. There is no reasonable interpretation of Loan Agreement whereby constructing balconies that never existed would be required to *keep* the Mortgaged Property in good order and repair or *prevent* deterioration. That is not a repair or replacement of any kind—but rather an improper demand to *improve* and *embetter* the Mortgaged Property.

While the balcony example is the most obvious error found on Lender's PCA, it is far from its only mistake. On the contrary, Lender's PCA contains countless flaws consistent with the foregoing example, such as its suggestion that Borrower should spend $420,000 to replace roofs. Notably, at origination, Lender commissioned Partner Engineering and Science, Inc. ("Partner

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 4

Engineering") to conduct a PCA. Partner Engineering's PCA report, dated April 3, 2020, noted that roofs were old at origination, yet estimated repair costs at just $78,125. While the Lender has broad discretion to request certain repairs and replacements, it has no discretion to demand Borrower turn the Mortgaged Property into something that it never was.

### Borrower PCA Identified Reasonable Repairs
### But Lender Ignored Borrower's Pleas to Reconcile Lender PCA Errors

Borrower commissioned Property Condition Assessment Consultants, Inc. ("Property Condition") to conduct an independent PCA. On December 31, 2025, Borrower submitted Property Condition's PCA along with a letter to the Lender, offering to conduct the repairs and replacements identified therein in the manner that reconciled the Lender's error-ridden PCA with Property Condition's PCA. However, Borrower's December 31, 2025 letter has gone completely unanswered.

Because Lender failed to identify actual Additional Lender Repairs and Additional Lender Replacements, Borrower did not have any obligation to deposit any funds. Yet, despite Borrower's good faith efforts to reconcile the mistakes in Lender's PCA, Lender still wrongfully sent its Notice of Default and Acceleration on the grounds that Borrower: (1) failed make repairs and replacements that were not *repairs* and *replacements* at all, and (2) failed to deposit funds for repairs and replacements that it never had an obligation to deposit.

### Lender's Cannot Hold Borrower in Default for
### Failing to Complete Repairs in Three Months

Even if Borrower had an obligation to make the alleged repairs and replacements, Borrower would have six months (for critical items) or twelve months (for non-critical items) to make such repairs and replacements. Yet, Lender's March 2, 2026 Notice of Default failed to give Borrower even four months from Servicer's November 14, 2025 Notice of Demand to complete $862,000-worth of work, despite its egregious errors. Lender's position is plainly unreasonable, at best, and bad faith, at worst—in addition to being unsupported by the express terms of the Loan Agreement.

### Lender Waived any Right to Demand Improper "Additional Deposit" by
### Electing to Accept Increased Monthly Replacement Reserve Deposit

Section 13.02(a)(4)—the basis for Lender's alleged Default—provides that "Lender may… require an additional deposit… *or* increase the amount of the Monthly Replacement Reserve Deposit"— *not both*. In Servicer's November 14, 2025, letter, it demanded Borrower deposit $862,000 with the Servicer *and* pay the increased Monthly Replacement Reserve Deposit of $3,227.83 per month starting January 1, 2026.

As Lender is aware, Borrower has paid the increased Monthly Replacement Reserve Deposit since January 1, 2026 and Lender has accepted those payments. By virtue of Lender's election of this remedy, Lender waived its right to elect an alternative remedy under Section 13.02(a)(4), namely the $862,000 deposit.

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 5


Moreover, Section 13.02(a)(4) only allows Lender to request Borrower deposit an amount into the Reserve/Escrow Accounts, and *not to the Servicer directly*. In other words, Servicer's demand of Borrower to deposit an amount with the Servicer directly is an improper and unenforceable request under the Loan Agreement. Borrower's refusal to deposit funds (1) directly to the Servicer in a manner that is not permitted under the Loan Agreement, (2) based on Lender's PCA that has no basis in reality, and (3) after Lender has accepted an alternative remedy of an increased monthly deposit, clearly cannot support an Event of Default.

### *Though Lender's Position is Clearly Untenable and Appears to have been Made in Bad Faith, Borrower Remains Willing to Negotiate in Good Faith*

For the numerous and non-exhaustive reasons explained above—including the fact that Lender has commissioned a PCA that demanded repairs and replacements of non-existent property features -—Borrower is confident no judge or arbitrator could ever find it in default under these circumstances. Any attempt to foreclose or otherwise pursue remedies upon default based on the record and Lender's articulated claims would be wholly improper and expose Lender to swift and decisive legal action initiated by Borrower,  as it is plainly obvious that at this time, Lender is the only party in breach of the Loan Agreement and inexplicably has acted inequitably by refusing Borrower's good faith efforts to address Lender's obvious mistakes. To be clear, should Lender refuse to engage in good faith discussions with the Borrower again and continue to pursue enforcement based on a fictitious default, Borrower will have no choice but to litigate and pursue all rights and remedies against Lender.

That said, the purpose of this letter is not to threaten litigation. Rather, Borrower desires to maintain the Collateral and work with Lender to resolve this matter reasonably and amicably. Accordingly, our client is willing to bring the amount on deposit in the Reserve/Escrow Accounts up to $506,000 for the purposes of making repairs and replacements, while Lender and Borrower enter good faith discussions regarding what actual repairs and replacements are required. However, Lender would need to agree to immediately release and return Borrower's deposit should these discussions break down and not result in a resolution of the disputed items. We trust and hope that the Lender will view this as a sign of Borrower's good faith.

If these terms are acceptable, please sign and return to me the revised Pre-Negotiation Agreement, attached hereto as Exhibit A. Given the current facts,  Borrower will not waive its rights, but expressly reserves all rights, remedies, claims, and defenses against Lender and Servicer. We look forward to Lender's response and its anticipated cooperation in engaging in good faith discussion with a goal of resolving this matter amicably.

Sincerely,

*/s/ Lincoln Chen*


CC:    Christine Kirchner (firm)

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 6

Keith M. Aurzada
Jay L. Krystinik
Haley B. Bray

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 7

## Exhibit A

## PRE-NEGOTIATION AGREEMENT

Fannie Mae alleges that J&R Multifamily Group, Ltd. ("Borrower") (collectively with Fannie Mae, the "Parties") is in Default of the May 5, 2020 Multifamily Security and Loan Agreement ("Loan Agreement") for failing to make certain repairs and replacements identified on Lender's Property Conditions Assessment report ("Lender's PCA"). Borrower denies that it is in default and commissioned its own Property Conditions Assessment report ("Borrower's PCA") to identify required repairs and replacements. To resolve their dispute, and in consideration of the mutual promises and covenants set forth herein, the Parties agree to engage in good faith discussions to reach an agreement on required repairs and replacements under the following terms:

1. <u>Parties' Rights and Remedies Not Affected</u>.  Borrower and Fannie Mae's rights and remedies shall not be affected or impaired in any way by reason of any or all of the following: (i) holding discussions; (ii) exchanging any correspondence among the parties; (iii) remitting the net operating income from the Property to the Original Lender, as Servicer; (iv) paying increased Monthly Replacement Reserve Deposit; or (v) depositing funds into the Reserve/Escrow Accounts, as defined in the Loan Agreement. Any and all of the foregoing shall not be deemed to act as a waiver of, or otherwise preclude, the exercise of any rights or remedies of Borrower, Fannie Mae or the Servicer under the Loan Documents or at law or equity, or from commencing or continuing the exercise of such rights or remedies.

2. <u>No Oral Modifications</u>.  No modification, extension, or amendment arising out of any discussions or correspondence pertaining to the Loan Documents shall be effective or binding unless in writing in the form of a Loan Modification.  Any party's willingness to enter into an agreement evidenced by a fully executed and delivered Loan Modification is within the sole discretion of each party, and the signature of an authorized agent for the party on a Loan Modification will conclusively evidence that the party has read and understood the Loan Modification. Each and every oral agreement to modify, extend or amend the terms and provisions of the Loan Documents is entirely unenforceable, and Borrower and Fannie Mae hereby waives any reliance on (i) any and all oral agreements to modify, extend or amend the terms and provisions of the Loan Documents and (ii) the matters, conditions, or events related to any and all such oral agreements to modify, extend or amend the Loan Documents.

3. <u>Preliminary Information; Credit Reports</u>.  Borrower agrees to provide Servicer and Fannie Mae with all documentation and such additional information regarding the Loan, the Property, Borrower as described in Exhibit A-1, attached.  Fannie Mae is authorized to obtain one or more credit reports or other asset reports on Borrower, the cost of which shall be reimbursed to Fannie Mae by Borrower.

4. <u>Top-up of Reserve/Escrow Accounts</u>.  As a demonstration of Borrower's interest in a potential workout/restructuring plan for the Loan, and understanding that Fannie Mae reserves all of its rights and remedies, Borrower agrees to top up the Reserve/Escrow Accounts to the amount of

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 8

repairs established in the PCA commissioned by Borrower ($506,000). Borrower shall complete the wire transfer within five (5) business days of execution of this agreement in the amount of approximately $506,000 less the amount already in the Reserve/Escrow Accounts, to be set aside and used solely for required repairs and replacements as determined by these discussions. If the Parties terminate these discussions without reaching an agreement on required repairs and replacements, Fannie Mae shall immediately release and authorize the return and refund of any and all amounts deposited by Borrower pursuant to this paragraph.

5.   Termination of Discussions.  Borrower or Fannie Mae may, in their sole and absolute discretion, unilaterally discontinue or terminate the discussions at any time for any reason without any liability whatsoever to the other party by reason of any such discontinuation or termination upon written notice.   Upon termination of discussions without reaching an agreement on required repairs and replacements, Fannie Mae shall immediately release, and authorize the return and refund of any and all amounts deposited pursuant to paragraph 4 of this Pre-Negotiation Agreement.

6.   Loan Documents.  Borrower and Fannie Mae acknowledges that each of the Loan Documents is valid, fully enforceable in accordance with its terms, and evidences legal and binding obligations which are in full force and effect.

7.   Authorized Representatives.  Matt Trent and Katie Dysart (of Fannie Mae) and Nathan Gauthier (of CWCapital Asset Management LLC, acting solely in its capacity as special servicer for Fannie Mae) authorized on behalf of Fannie Mae and Kevin Sullivan (of Servicer) is authorized on behalf of Servicer to hold discussions with you.  Harry Shani, Jaikishin Bhagia, Jay Shani, and the attorneys at the law firm of Chamberlain, Hrdlicka, White, Williams, and Aughtry, P.C. are authorized on behalf of Borrower to hold such discussions.  In connection with potential resolution discussions, Fannie Mae and Borrower's execution of this letter agreement confirms that each of their respective representatives named herein are authorized on behalf of Fannie Mae or Borrower, respectively, to hold such discussions.  Such authorization remains in effect until changed in writing by the applicable party.

8.   Lender Relationship; Participation; Credit Loss Insurance.  Borrower acknowledges that Fannie Mae is the owner and holder of the note executed in connection with the Loan and that the Servicer is servicing the Loan under its lender/servicer agreement with Fannie Mae.  Borrower further acknowledges that although Fannie Mae may be the sole holder of the note, other parties such as Servicer, loan participants, credit loss insurance, REMIC, or other mortgage investors, may share in the losses incurred on the Loan; however, such agreements and relationships, if any, are between Fannie Mae and such third parties, and Borrower is neither a party to, nor a beneficiary of, any such agreements or relationships.

9.   Entire Agreement.   This letter agreement constitutes the entire pre-negotiation agreement between the parties concerning its subject matter and supersedes any prior or contemporaneous representations or agreements not contained herein concerning any modifications to the Loan or concerning any of the parties' rights, remedies, or obligations thereunder.

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 9

10. <u>Counterparts</u>.  This letter agreement may be executed in counterparts, each of which shall be deemed an original and all which together shall be deemed one instrument.

11. <u>Electronic Mail Signature Binding</u>.  To expedite the discussions contemplated herein, electronic mail signatures may be used in place of original signatures on this letter.  Fannie Mae, Servicer, Borrower, and Key Principals intend to be bound by the signatures on the electronic mail document, are aware that the other party will rely on the electronic mail signatures, and hereby waive any defenses to the enforcement of the terms of this letter, based on the form of signature.

12. <u>No Foreclosure or Enforcement of Remedies Upon Default</u>.  To ensure the Parties can negotiate in good faith, Fannie Mae agrees it will not pursue Foreclosure or any other Remedies Upon Default, so long as this Pre-Negotiation Agreement is in force, and has not been terminated by either Fannie Mae or Borrower.

If you agree with the foregoing, please execute a copy of this letter and return the same to the undersigned within five (5) business days from the date of your receipt.  No discussions shall be held until the undersigned until this Pre-Negotiation Agreement is fully executed.

*[Acknowledgment and agreement signatures of the parties appear on the following page.]*

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 10

ACKNOWLEDGED AND AGREED this _____ day of _____, 2026.

**FANNIE MAE**:

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND AGREED this _____ day of _____, 2026.

**SERVICER**:

**JONES LANG LASALLE MULTIFAMILY, LLC, a Delaware limited liability company**

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND AGREED this ___ day of _____, 2026.

**BORROWER**:

**J&R MULTIFAMILY GROUP, LTD.**, a Texas limited partnership

By: _____
Name: _____
Title: _____

ACKNOWLEDGED AND AGREED this ___ day of _____, 2026.

**KEY PRINCIPALS:**

_____
Harry Shani

_____
Jaikishin Bhagia

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 11

**Exhibit A-1**

**LIST OF INFORMATION REQUIRED TO BE FURNISHED BY BORROWER**

A.　Borrower Information

　　1.　Borrowers' organizational documents, with all amendments, including all partnerships and members of the Borrower structures and their respective residency and/or principal place of business.

　　2.　Offering circular from syndication, if applicable

　　3.　Advise if each current owner is the original borrower or a subsequent assumptor

　　4.　Completed and signed Form W-9 - Request for Taxpayer Identification Number and Certification for each borrower on the current form published by the Internal Revenue Service.

B.　Project Information

　　1.　Physical Condition
　　　　a.　If new, identify any construction problems or defects
　　　　b.　If existing, identify any repairs needed

　　2.　Occupancy
　　　　a.　Identify the number of vacant units and pre-leased units
　　　　b.　Identify the number of occupied and income-producing units
　　　　c.　Identify the number of non-revenue units, i.e.: models, employee units, storage and out of service units
　　　　d.　Describe any concessions at property and in market

　　3.　Quantify the turnover of units for the past twelve months

　　4.　Number of new units online in subject property's market and absorption

　　5.　Management plan and copy of management contract

C.　Financial Information

　　1.　Project Operating Statements and Information
　　　　a.　Provide 2025 monthly operating statements,
　　　　b.　Provide 2026 monthly operating statements by April 20, 2026;
　　　　c.　Provide a monthly accounting of 2025 net operating income; and

Devan J. Dal Col
REED SMITH LLP
March 18, 2026
Page 12

        d.      Provide an aging of accounts payable.

2.     Junior Liens
Provide copies of documents pertaining to any subordinate debt or other liens, including mezzanine debt, and identify amounts, lienholders, relationship of lienholders to the borrowing entity and/or partners/members, and status of each loan

3.     Provide current financial statements (less than 90 days old) of Borrowing entity.

D.     <u>Borrowers' Request or Proposal</u>

Borrower shall agree to top up the Reserve/Escrow Accounts to an amount equivalent to the amount stated in Borrower's PCA ($506,000) and perform repairs and replacements within a period of no later than 120 days from the date the Parties reach an agreement on required repairs and replacements pursuant to these discussions.



# Loan: 48660 (As of: 04/30/2026)

| | Loan Overview | Terms | Scheduled Payments | **Payment History** | Escrow Information | Service Requests | Documents | Contact Information |

## Payment History

| | Transaction Date | Due Date | Principal Amount | Interest Amount | Prepaid Principal | Subsidy | Escrow Amount | Late Fees | Miscellaneous Fees |
|---|---|---|---|---|---|---|---|---|---|
| Replacement Reserve... | 03/31/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | 234.42 | 0.00 | 0.00 |
| Miscellaneous Interest | 03/31/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | 54.32 | 0.00 | 0.00 |
| Sundry Disbursement | 03/25/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | -113,947.82 | 0.00 | 0.00 |
| Reserve Disbursement | 03/25/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | -190,149.27 | 0.00 | 0.00 |
| Reserve Disbursement | 03/25/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | -42,654.78 | 0.00 | 0.00 |
| Sundry Disbursement | 03/25/2026 | | 0.00 | 0.00 | 0.00 | 0.00 | -234,703.02 | 0.00 | 0.00 |
| Scheduled Payment | 02/06/2026 | 02/01/2026 | 29,682.33 | 42,551.99 | 0.00 | 0.00 | 59,324.01 | 0.00 | 0.00 |
| Insurance Payment | 02/02/2026 | 03/05/2026 | 0.00 | 0.00 | 0.00 | 0.00 | -3,946.00 | 0.00 | 0.00 |
| Scheduled Payment | 01/06/2026 | 01/01/2026 | 29,601.02 | 42,633.30 | 0.00 | 0.00 | 59,324.01 | 0.00 | 0.00 |
| Miscellaneous Interest | 12/31/2025 | | 0.00 | 0.00 | 0.00 | 0.00 | 62.27 | 0.00 | 0.00 |
| Replacement Reserve... | 12/31/2025 | | 0.00 | 0.00 | 0.00 | 0.00 | 226.08 | 0.00 | 0.00 |
| Tax Payment | 12/15/2025 | 12/31/2025 | 0.00 | 0.00 | 0.00 | 0.00 | -31,076.13 | 0.00 | 0.00 |
| Tax Payment | 12/10/2025 | 12/31/2025 | 0.00 | 0.00 | 0.00 | 0.00 | -232,786.64 | 0.00 | 0.00 |
| Tax Payment | 12/10/2025 | 12/31/2025 | 0.00 | 0.00 | 0.00 | 0.00 | -191,928.81 | 0.00 | 0.00 |
| Scheduled Payment | 12/08/2025 | 12/01/2025 | 30,894.16 | 41,340.16 | 0.00 | 0.00 | 56,096.18 | 0.00 | 0.00 |

1 2 3 4 5 6 7 8 9 10 ... ▶ ⏭   | 15 ▼ | items per page     1 - 15 of 249 items

EXHIBIT
A-6

Case 1:26-cv-03985 Document 1-1 Filed 05/19/26 in TXSD Page 98 of 122

**From:** Dal Col, Devan J.
**To:** Chen, Lincoln
**Cc:** Bray, Haley B.
**Subject:** RE: Worthington - Site Visit - April 2, 2026
**Date:** Wednesday, April 8, 2026 7:23:19 AM

<!--[endif]-->

[CAUTION - EXTERNAL EMAIL] DO NOT reply, click links, or open attachments unless you have verified the sender and know the content is safe.

Lincoln,

I am writing to follow up on our Notice of Additional Default and Reservation of Rights letters. Fannie Mae is prepared to allow five (5) business days for deposit with the Servicer of the amount referenced in the Notice of Default and Acceleration dated March 2, 2026. Upon receipt of such deposit, we would welcome the opportunity to discuss completion of the required repairs and the potential for a forbearance arrangement during the repair period. In the absence of timely deposit, however, Fannie Mae intends to pursue all available remedies in accordance with the Loan Documents.

Please do not hesitate to reach out should you have any questions.

Devan

**Devan Dal Col**
Associate
*She/Her/Hers*

ddalcol@reedsmith.com
D: +1 (469) 680-4280
M: +1 (469) 816-9302

**Reed Smith**
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
T: +1 469 680 4200
F: +1 469 680 4299
reedsmith.com

---

**From:** Dal Col, Devan J. <DDalCol@reedsmith.com>
**Sent:** Tuesday, March 31, 2026 9:41 AM
**To:** Chen, Lincoln <Lincoln.Chen@chamberlainlaw.com>
**Cc:** Bray, Haley B. <HBray@reedsmith.com>
**Subject:** RE: Worthington - Site Visit - April 2, 2026

Lincoln,

Thank you for confirming **April 2 at 10:00 a.m.** for a site visit at The Worthington, Haley (cc'd) will be our contact from Reed Smith.

With regard to your question, please see the attached correspondence, which I will send to Borrower as well.

Devan

**Devan Dal Col**
Associate
*She/Her/Hers*

ddalcol@reedsmith.com
D: +1 (469) 680-4280
M: +1 (469) 816-9302

**Reed Smith**
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
T: +1 469 680 4200
F: +1 469 680 4299
reedsmith.com

---

**From:** Chen, Lincoln <Lincoln.Chen@chamberlainlaw.com>
**Sent:** Thursday, March 26, 2026 3:22 PM
**To:** Dal Col, Devan J. <DDalCol@reedsmith.com>
**Cc:** Bray, Haley B. <HBray@reedsmith.com>
**Subject:** RE: Worthington - Site Visit - April 2, 2026

External E-Mail - FROM Chen, Lincoln <lincoln.chen@chamberlainlaw.com>

Devan,

I've confirmed the date and time with my client. I will be your point of contact at the property, so please have your people contact me when they arrive. Please call my direct line, which will redirect to my cell. I look forward to meeting your team there.

On a related note, as I mentioned in my March 18 letter and March 19 email, my client made its monthly loan payment on March 6, 2026, but it was subsequently credited back to their account on March 12, 2026. I never received a response to my questions regarding why that was done, whether that was intentional, and whether future payments would be rejected. Given that we did not receive a response, my client has re-wired the money, and your client should receive confirmation of payment either today or tomorrow. Please note that it may come as two separate payments.

Please confirm receipt and that the payment(s) will be properly applied to the loan. Additionally, my questions regarding why the March 6 payment was credited back, and whether your client intends to accept future payments, remain outstanding. I would appreciate a response at your earliest convenience. Thank you.

Sincerely,

**Lincoln Chen**
**Shareholder**

T 713.658.1818 | D 713.654.9690 | F 713.658.2553
lincoln.chen@chamberlainlaw.com

Confidentiality Notice: This message and its contents are confidential and likely privileged. If you received this message in error, do not use or rely upon it. Instead, please inform the sender and then delete it.

---

**From:** Dal Col, Devan J. <DDalCol@reedsmith.com>
**Sent:** Thursday, March 26, 2026 12:25 PM
**To:** Chen, Lincoln <Lincoln.Chen@chamberlainlaw.com>
**Cc:** Bray, Haley B. <HBray@reedsmith.com>

EXHIBIT

A-7

**Subject:** Worthington - Site Visit - April 2, 2026

[CAUTION - EXTERNAL EMAIL] DO NOT reply, click links, or open attachments unless you have verified the sender and know the content is safe.

Lincoln,

I can confirm that representatives from Fannie Mae, CW, and my colleague Haley (cc'd) will be able to make a visit to the Worthington on **Thursday, April 2** around 10:00 a.m. Can you please confirm that date with your client?

Is there anyone at the property they should be in contact with? Happy to pass along any contact information that would help them connect on April 2.

Devan

**Devan Dal Col**
Associate
*She/Her/Hers*

ddalcol@reedsmith.com
D: +1 (469) 680-4280
M: +1 (469) 816-9302

**Reed Smith**
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
T: +1 469 680 4200
F: +1 469 680 4299
**reedsmith.com**

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021

[CAUTION - EXTERNAL EMAIL] DO NOT reply, click links, or open attachments unless you have verified the sender and know the content is safe.

I can confirm that representatives from Fannie Mae, CW, and my colleague Haley (cc'd) will be able to make a visit to the Worthington on **Thursday, April 2**

| | |
|---|---|
| **From:** | Jay Shani <rsgeneralpartner@gmail.com> |
| **Sent:** | Monday, May 11, 2026 12:32 PM |
| **To:** | Kevin Sullivan; Fernando Salazar; Devan J. Dal Col,; Trent, Matt |
| **Subject:** | Re: Loan 48660 Worthington |
| **Attachments:** | Screenshot 2026-04-30 at 3.35.10 PM.png |

Reminder: Please reply.

On Fri, May 8, 2026 at 8:59 AM Jay Shani <rsgeneralpartner@gmail.com> wrote:
 Reminder

On Thu, May 7, 2026 at 8:00 AM Jay Shani <rsgeneralpartner@gmail.com> wrote:
 Hello Kevin, Fernando, Devan

 Someone, please reply.

 Thanks

 Jay Shani

 On Wed, May 6, 2026 at 12:55 PM J <rsgeneralpartner@gmail.com> wrote:
 Hello Kevin
 Reminder.  Please let me know.
 Thanks
 Jay Shani


 On May 4, 2026, at 1:33 PM, Jay Shani <rsgeneralpartner@gmail.com> wrote:


 Hello Kevin
 Reminder: Please let me know.
 Thanks
 Jay Shani

 On Thu, Apr 30, 2026 at 3:45 PM Jay Shani <rsgeneralpartner@gmail.com> wrote:

 Good afternoon Kevin,

 I hope you're doing well.

 I was hoping you could help clarify a few items related to the escrows
 and the JLL portal:

1

**EXHIBIT**

**A-8**

1. The portal reflects several disbursements dated March 25, 2026 (234,703.02; 42,654.78; 190,149.27; and 113,947.02), but I'm not seeing any supporting documentation. I've attached a screenshot for reference—could you please provide the backup for these?
2. With our insurance payment coming up on May 17, 2026, can you confirm whether the escrowed funds will be available for that payment, and if so, what the process will be?
3. We've made our March and April mortgage payments, but they don't appear on the portal yet. Could you confirm receipt and advise when those will be reflected?

Appreciate your help on this. Please let me know if you need anything further from my end.

Thanks,
Jay Shani

2

From: **Dave Quiros** <accountant@multifamilyhouston.com>
Date: Thu, May 7, 2026 at 2:29 PM
Subject: Fwd: Draw 24 for J&R Multifamily Group Ltd Loan Number 48660
To: Salazar, Fernando <fernando.salazar@jll.com>


Hi Fernando,

This is the other Disbursement request Loan 48860 that I would like to follow up on. Could you please provide an update on the current status of this request and let us know if any further information is required from our side to expedite the processing?

We would appreciate any information you can provide regarding the expected timeline for disbursement.

Thanks,

Dave Quiros
---------- Forwarded message ---------
From: **Dave Quiros** <accountant@multifamilyhouston.com>
Date: Tue, Jan 27, 2026 at 4:06 PM
Subject: Draw 24 for J&R Multifamily Group Ltd Loan Number 48660
To: JLL REC Asset Management - Draw Requests <DrawRequest@am.jll.com>, Salazar, Fernando <fernando.salazar@jll.com>, Jacky Bhagia <jbhagia@yahoo.com>, Jay Shani <rsgeneralpartner@gmail.com>


Hi Fernando,

I have attached the files related to **Draw 24 for J&R Multifamily Group Ltd.**
For your convenience, I organized the files into separate PDF documents for each vendor. These PDFs are aligned with the relevant sections in the accompanying Excel file.

Should you have any questions or need further clarification regarding the contents of these files, please feel free to contact me at 832-918-0072.

Thanks,
Dave

**EXHIBIT
A-9**



# INVOICE

**INVOICE NUMBER**
J&R Multifamily Group LTD  -0005

**BILLED TO**
J & R MULTIFAMILY GROUP LTD
1350 Greens Parkway
Houston, TX 77067

**INSURED PROPERTIES**
The Worthington at the Beltway
1350 Greens parkway
Houston, TX  77067

**DATE OF ISSUE**
5/8/2026

**InsuredBiz**
682-552-3001
zeeniak@insuredbiz.com
www.insuredbiz.com

| DESCRIPTION | ANNUAL PREMIUM |
|---|---|
| Commercial General Liability Insurance; Policy #06928086 | |
| Policy Period : 5/08/2026-5/08/2027 | $40,896.11 |
| Umbrella Liability Insurance; Policy # 06931519 | |
| Policy Period :  5/08/2026-5/08/2027 | |
| **INVOICE TOTAL** | $40,896.11 |

**INVOICE TOTAL**

# $40,896.11

**Name & Adress of the Payee**
KGN 5 LLC dba INSUREDBIZ
1107 Messina Lane
Richmond, TX 77469

**TERMS**
Invoice is due immediately
Policies are subject to cancellation if payment is not received within 7 working days from the due date.

EXHIBIT
**A-10**

CAUSE NO. _____

| | | |
|---|---|---|
| **J&R MULTIFAMILY GROUP, LLC,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| **FEDERAL NATIONAL MORTGAGE** | § | |
| **ASSOCIATION and JONES LANG** | § | |
| **LASALLE MULTIFAMILY, LLC,** | § | |
| *Defendants*. | § | **_____ JUDICIAL DISTRICT** |

## <u>TEMPORARY RESTRAINING ORDER</u>

The Court, having considered Plaintiff J&R Multifamily Group, Ltd's ("J&R") Application for Temporary Restraining Order and Temporary Injunction against Defendants Federal National Mortgage Association ("Fannie Mae") and   Jones Lang LaSalle Multifamily, LLC ("JLL")(collectively, "Defendants"), any responses or replies thereto, any argument, and the evidence presented, the Court makes the following findings:

### A.  Factual Findings

1.  On May 5, 2020, J&R entered into the Loan Agreement with JLL to refinance its mortgage of the Mortgaged Property. JLL assigned the loan to Fannie Mae while continuing to serve as loan Servicer.

2.  To date, J&R has never missed a monthly payment.

3.  On September 25, 2025, JLL conducted a Property Condition Assessment ("PCA"), which concluded that the Mortgaged Property required repairs that were impossible, including repairing the wooden balconies of 362 units, even though only 193 units had wooden balconies.

4.  On November 14, 2025, JLL demanded in writing that J&R make the repairs identified in its PCA. JLL further demanded that J&R (1) deposit $862,000 "with the Servicer"

within thirty days "as additional security for the Loan," and (2) increase its monthly replacement reserve deposits by $3,227.83.

5. J&R paid the increased monthly replacement reserve deposits, which JLL accepted. J&R did not deposit $862,000 "with the Servicer," JLL.

6. On December 31, 2025, J&R sent JLL letter informing JLL of the errors in JLL's PCA. J&R attached its own PCA and requested a meeting to reconcile the issues. JLL ignored this request for a good faith discussion.

7. On March 2, 2026, Fannie Mae sent its Notice of Default and Acceleration, holding J&R in default for failing to comply with JLL's November 14, 2025 demand.

8. On March 18, 2026, J&R sent a letter to Fannie Mae, explaining that Fannie Mae's Notice was improper because (a) Defendants demanded that J&R repair balconies that have never existed and make nonsensical roof repairs; (b) Defendants had waived their right to the $862,000 deposit under Section 13.02(a)(4) by electing the alternative remedy of an increased Monthly Replacement Reserve Deposit; and (c) The loan agreement does not provide for direct deposit vaguely "to the Servicer."

9. Defendants requested an inspection of the Mortgaged Property, and the Parties scheduled and inspection for April 2, 2026.

10. On March 25, 2026, JLL unilaterally removed $581,454.89 from J&R's escrow and reserve accounts without notice and disbursed the funds to itself, however, J&R did not discover these disbursements until April 29, 2026 as JLL never provided notice.

11. These accounts exist to allow J&R to seek reimbursement for funds spent on repairs, maintenance, and insurance.

2

12. Because J&R was not aware that JLL had depleted the accounts, in good faith, it continued to make its regular mortgage payments and monthly escrow deposits. These payments, however, never appeared in JLL's system.

13. Because the escrow and reserve accounts exist to fund repairs, upkeep and insurance, the depletion of J&R's escrow accounts impairs J&R's ability to operate the Mortgaged Property and address the maintenance, repair, and insurance issues.

14. Defendants did not address the removal of funds from J&R's accounts or the issues raised in J&R's March 25, 2026 letter, Fannie Mae sent another Notice of Additional Defaults and Demand for Payment on March 31, 2026.

15. The defaults alleged in Fannie Mae's Notice of Additional Defaults are also meritless.

16. Since April 30, 2026, J&R has emailed Defendants, requesting clarification regarding the disbursements JLL made to itself. Defendants have ignored J&R's emails.

17. On May 7, 2026, J&R sent a follow up email to Defendants, requesting clarification regarding its January 27, 2026 disbursement request for repairs made to the Mortgaged Property. Defendants have ignored J&R's email.

18. On May 8, 2026, J&R received an invoice from its insurance carrier requesting payment by May 17, 2026 for General Liability Insurance.

19. Another Insurance Invoice is forthcoming by May 15th in the amount of $138,881.45 for Property Insurance and J&R has no clear insight that Fannie Mae will disburse payment from J&R's Escrow.

**B. Causes of Action**

3

20. J&R has president evidence supporting valid causes of action for Declaratory Judgment, Breach of Contract, Conversion, Violation of the Theft Liability Act, and Money Had and Received.

## C. Probable Right to Relief

21. J&R presented evidence to show that is is likely to succeed on the merits of his claims because there is sufficient evidence to establish a prima facie showing of each elements his causes of action.

## D. Probable and Imminent Harm

22. Plaintiff presented sufficient evidence to suggest Defendants have engaged in a pattern of actions that indicate they will stop at nothing to hold J&R in default whether they have any basis to do so or not. Defendants continue to threaten remedies such as foreclosure, and even seek to extort J&R into waiving its rights just to have a good faith discussion.

23. J&R has already sustained actual injuries as a result of Defendants' unconscionable conduct, including but not limited to the depletion of the escrow accounts J&R has been depositing funds into since origination for the purpose of maintaining the Mortgaged Property. With these accounts depleted, J&R cannot seek reimbursement for costs to maintain the Mortgaged Property.

24. Unless the Court enjoins Defendants, J&R will continue to suffer probable and imminent and ongoing harm.

## E. Irreparable Injury

25. The parties stand in disparate positions of control and the Defendants have exhibited a pattern of deceptive conduct calculated to defeat the J&R's contractual interests,

4

including a willingness to dissipate or misappropriate assets to enrich themselves.

26. Unless Defendants are enjoined, J&R is wrongfully barred from drawing on the Reserve and Escrow Accounts it itself funded for the specific purpose of maintaining the Mortgaged Property. Without access to those funds, J&R cannot:

o Perform timely repairs and replacements required to keep the 362-unit Mortgaged Property habitable;

o Pay property insurance premiums when due. The next premium / renewal is due on May 17, 2026 and a lapse exposes J&R to uninsured liability and constitutes an additional automatic Event of Default under § 14.01(a)(2) of the Loan Agreement;

o Pay property tax obligations and other operating expenses; and

o Fulfill its obligations as landlord to its tenants who reside at the Mortgaged Property, including J&R's implied warranty of habitability under Texas Property Code § 92.052.

## F.  No Adequate Remedy at Law

27. No subsequent award of damages can compensate J&R for damaged to their real property if repairs cannot be made, restore the harm to J&R's reputation and relationship with its tenants, restore an insurance policy allowed to lapse before renewal, protect a property from risk of not being insured, or compensate a tenant injured by deferred maintenance.

## G.  Mandatory Injunction is Appropriate

28. Mandatory injunctive relief is appropriate here because Section 13.02(a) of the Loan Agreement creates an unambiguous framework whereby J&R deposits funds, Defendants hold deposited funds in specifically named accounts, then disburse funds on Borrower's request and after satisfaction of conditions. Defendants' right to retain or apply the funds outside that process arises only on a continuing Event of Default, a condition precedent that Defendants have manufactured and which does not even exist.

5

The duty to refrain from self-disbursement and to honor proper disbursement requests is not just a matter of business judgment or discretion, it is a written contractual obligation.

29. For months, J&R disputed Defendants' claim of default with uncontroverted facts, yet based solely on that alleged default, Defendants depleted J&R's escrow accounts anyway. In order to restore the Parties to the last, actual, peaceable, noncontested status which preceded the pending controversy, Defendants must return the depleted funds into the escrow accounts.

In light of the foregoing, the Court finds that Plaintiff J&R is entitled to a Temporary Restraining Order because it will suffer imminent irreparable harm for which J&R has no adequate remedy at law. IT IS THEREFORE ORDERED that Defendants Federal National Mortgage Association and Jones Lang LaSalle Multifamily, LLC are restrained and enjoined from:

a. holding or continuing to hold J&R in Default under the Loan Agreement;

b. taking any action to enforce, foreclose on, accelerate, post for sale, impair J&R's credit, declare further default under, or otherwise act upon the alleged Event of Default declared in Defendants' March 2, 2026 Notice of Default and Acceleration or the additional defaults asserted in Defendants' March 31, 2026 Notice of Additional Defaults;

c. relying on, asserting, or further acting upon the September 25, 2025 Property Condition Assessment or the November 14, 2025 demand letter as a basis for any default, fee, charge, or other remedy;

d. making any disbursements from the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, except in response to a properly submitted disbursement request from J&R under § 13.02(a) of the Loan Agreement;

e. refusing to honor J&R's properly submitted disbursement requests under § 13.02(a)(5) of the Loan Agreement;

6

f.   communicating with any third party (including any rating agency, secondary-market participant, insurer, vendor, or tenant) regarding the alleged default of J&R under the Loan; and

g.   transferring, assigning, selling, or otherwise disposing of any interest in the Loan or Loan Documents pending the temporary injunction hearing.

IT IS FURTHER ORDERED that Defendants Federal National Mortgage Association and Jones Lang LaSalle Multifamily, LLC are required:

a.   within one business day of the order, to restore to the applicable Reserve and Escrow Accounts the funds JLL disbursed to itself on or about March 25, 2026, in the aggregate amount of $581,454.89, with itemization of which account each restored amount is allocated to;

b.   to process J&R's future disbursement requests under § 13.02(a)(5) and (6) of the Loan Agreement in the ordinary course, on the timelines and in the amounts provided thereunder, pending final trial; and

c.   to acknowledge the loan to be in good standing.

pending a final trial on the merits or further order of this Court.

IT IS FURTHER ORDERED, that this case shall be set for a Temporary Injunction hearing of this matter on the _____ day of _____ 2020 at ___:___ a.m./p.m. CST. in the ____ Judicial District Court of Harris County, Texas.

IT IS FURTHER ORDERED that this Temporary Restraining Order will expire on the ____ day of _____, 2024.

IT IS FURTHER ORDERED that Plaintiff will post bond in the amount of $_____ before the issuance of the Temporary Restraining Order.

The Clerk shall issue a temporary restraining order in conformity with the law and the terms of this Order.

SIGNED on this _____ day of _____ 2026.

_____
HONORABLE PRESIDING JUDGE

7

5/13/2026 5:18:30 PM
Marilyn Burgess District Clerk
Harris County
Envelope No: 114870147
By: SOLIS, ADILIANI A
Filed: 5/13/2026 5:18:30 PM

## 2026-32250 / Court: 151

CAUSE NO. _____

| | | |
|---|---|---|
| **J&R MULTIFAMILY GROUP, LLC,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| **FEDERAL NATIONAL MORTGAGE** | § | |
| **ASSOCIATION and JONES LANG** | § | |
| **LASALLE MULTIFAMILY, LLC,** | § | |
| *Defendants.* | § | **_____ JUDICIAL DISTRICT** |

## TEMPORARY RESTRAINING ORDER

The Court, having considered Plaintiff J&R Multifamily Group, Ltd's ("J&R") Application for Temporary Restraining Order and Temporary Injunction against Defendants Federal National Mortgage Association ("Fannie Mae") and Jones Lang LaSalle Multifamily, LLC ("JLL")(collectively, "Defendants"), any responses or replies thereto, any argument, and the evidence presented, the Court makes the following findings:

### A. Factual Findings

1. On May 5, 2020, J&R entered into the Loan Agreement with JLL to refinance its mortgage of the Mortgaged Property. JLL assigned the loan to Fannie Mae while continuing to serve as loan Servicer.

2. To date, J&R has never missed a monthly payment.

3. On September 25, 2025, JLL conducted a Property Condition Assessment ("PCA"), which concluded that the Mortgaged Property required repairs that were impossible, including repairing the wooden balconies of 362 units, even though only 193 units had wooden balconies.

4. On November 14, 2025, JLL demanded in writing that J&R make the repairs identified in its PCA. JLL further demanded that J&R (1) deposit $862,000 "with the Servicer"

within thirty days "as additional security for the Loan," and (2) increase its monthly replacement reserve deposits by $3,227.83.

5. J&R paid the increased monthly replacement reserve deposits, which JLL accepted. J&R did not deposit $862,000 "with the Servicer," JLL.

6. On December 31, 2025, J&R sent JLL letter informing JLL of the errors in JLL's PCA. J&R attached its own PCA and requested a meeting to reconcile the issues. JLL ignored this request for a good faith discussion.

7. On March 2, 2026, Fannie Mae sent its Notice of Default and Acceleration, holding J&R in default for failing to comply with JLL's November 14, 2025 demand.

8. On March 18, 2026, J&R sent a letter to Fannie Mae, explaining that Fannie Mae's Notice was improper because (a) Defendants demanded that J&R repair balconies that have never existed and make nonsensical roof repairs; (b) Defendants had waived their right to the $862,000 deposit under Section 13.02(a)(4) by electing the alternative remedy of an increased Monthly Replacement Reserve Deposit; and (c) The loan agreement does not provide for direct deposit vaguely "to the Servicer."

9. Defendants requested an inspection of the Mortgaged Property, and the Parties scheduled and inspection for April 2, 2026.

10. On March 25, 2026, JLL unilaterally removed $581,454.89 from J&R's escrow and reserve accounts without notice and disbursed the funds to itself, however, J&R did not discover these disbursements until April 29, 2026 as JLL never provided notice.

11. These accounts exist to allow J&R to seek reimbursement for funds spent on repairs, maintenance, and insurance.

2

12. Because J&R was not aware that JLL had depleted the accounts, in good faith, it continued to make its regular mortgage payments and monthly escrow deposits. These payments, however, never appeared in JLL's system.

13. Because the escrow and reserve accounts exist to fund repairs, upkeep and insurance, the depletion of J&R's escrow accounts impairs J&R's ability to operate the Mortgaged Property and address the maintenance, repair, and insurance issues.

14. Defendants did not address the removal of funds from J&R's accounts or the issues raised in J&R's March 25, 2026 letter, Fannie Mae sent another Notice of Additional Defaults and Demand for Payment on March 31, 2026.

15. The defaults alleged in Fannie Mae's Notice of Additional Defaults are also meritless.

16. Since April 30, 2026, J&R has emailed Defendants, requesting clarification regarding the disbursements JLL made to itself. Defendants have ignored J&R's emails.

17. On May 7, 2026, J&R sent a follow up email to Defendants, requesting clarification regarding its January 27, 2026 disbursement request for repairs made to the Mortgaged Property. Defendants have ignored J&R's email.

18. On May 8, 2026, J&R received an invoice from its insurance carrier requesting payment by May 17, 2026 for General Liability Insurance.

19. Another Insurance Invoice is forthcoming by May 15th in the amount of $138,881.45 for Property Insurance and J&R has no clear insight that Fannie Mae will disburse payment from J&R's Escrow.

**B. Causes of Action**

3

20. J&R has president evidence supporting valid causes of action for Declaratory Judgment, Breach of Contract, Conversion, Violation of the Theft Liability Act, and Money Had and Received.

**C. Probable Right to Relief**

21. J&R presented evidence to show that is is likely to succeed on the merits of his claims because there is sufficient evidence to establish a prima facie showing of each elements his causes of action.

**D. Probable and Imminent Harm**

22. Plaintiff presented sufficient evidence to suggest Defendants have engaged in a pattern of actions that indicate they will stop at nothing to hold J&R in default whether they have any basis to do so or not. Defendants continue to threaten remedies such as foreclosure, and even seek to extort J&R into waiving its rights just to have a good faith discussion.

23. J&R has already sustained actual injuries as a result of Defendants' unconscionable conduct, including but not limited to the depletion of the escrow accounts J&R has been depositing funds into since origination for the purpose of maintaining the Mortgaged Property. With these accounts depleted, J&R cannot seek reimbursement for costs to maintain the Mortgaged Property.

24. Unless the Court enjoins Defendants, J&R will continue to suffer probable and imminent and ongoing harm.

**E. Irreparable Injury**

25. The parties stand in disparate positions of control and the Defendants have exhibited a pattern of deceptive conduct calculated to defeat the J&R's contractual interests,

4

including a willingness to dissipate or misappropriate assets to enrich themselves.

26. Unless Defendants are enjoined, J&R is wrongfully barred from drawing on the Reserve and Escrow Accounts it itself funded for the specific purpose of maintaining the Mortgaged Property. Without access to those funds, J&R cannot:

- o  Perform timely repairs and replacements required to keep the 362-unit Mortgaged Property habitable;

- o  Pay property insurance premiums when due. The next premium / renewal is due on May 17, 2026 and a lapse exposes J&R to uninsured liability and constitutes an additional automatic Event of Default under § 14.01(a)(2) of the Loan Agreement;

- o  Pay property tax obligations and other operating expenses; and

- o  Fulfill its obligations as landlord to its tenants who reside at the Mortgaged Property, including J&R's implied warranty of habitability under Texas Property Code § 92.052.

**F.  No Adequate Remedy at Law**

27. No subsequent award of damages can compensate J&R for damaged to their real property if repairs cannot be made, restore the harm to J&R's reputation and relationship with its tenants, restore an insurance policy allowed to lapse before renewal, protect a property from risk of not being insured, or compensate a tenant injured by deferred maintenance.

**G.  Mandatory Injunction is Appropriate**

28. Mandatory injunctive relief is appropriate here because Section 13.02(a) of the Loan Agreement creates an unambiguous framework whereby J&R deposits funds, Defendants hold deposited funds in specifically named accounts, then disburse funds on Borrower's request and after satisfaction of conditions. Defendants' right to retain or apply the funds outside that process arises only on a continuing Event of Default, a condition precedent that Defendants have manufactured and which does not even exist.

5

The duty to refrain from self-disbursement and to honor proper disbursement requests is not just a matter of business judgment or discretion, it is a written contractual obligation.

29. For months, J&R disputed Defendants' claim of default with uncontroverted facts, yet based solely on that alleged default, Defendants depleted J&R's escrow accounts anyway. In order to restore the Parties to the last, actual, peaceable, noncontested status which preceded the pending controversy, Defendants must return the depleted funds into the escrow accounts.

In light of the foregoing, the Court finds that Plaintiff J&R is entitled to a Temporary Restraining Order because it will suffer imminent irreparable harm for which J&R has no adequate remedy at law. IT IS THEREFORE ORDERED that Defendants Federal National Mortgage Association and Jones Lang LaSalle Multifamily, LLC are restrained and enjoined from:

a. holding or continuing to hold J&R in Default under the Loan Agreement;

b. taking any action to enforce, foreclose on, accelerate, post for sale, impair J&R's credit, declare further default under, or otherwise act upon the alleged Event of Default declared in Defendants' March 2, 2026 Notice of Default and Acceleration or the additional defaults asserted in Defendants' March 31, 2026 Notice of Additional Defaults;

c. relying on, asserting, or further acting upon the September 25, 2025 Property Condition Assessment or the November 14, 2025 demand letter as a basis for any default, fee, charge, or other remedy;

d. making any disbursements from the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, except in response to a properly submitted disbursement request from J&R under § 13.02(a) of the Loan Agreement;

e. refusing to honor J&R's properly submitted disbursement requests under § 13.02(a)(5) of the Loan Agreement;

6

f.  communicating with any third party (including any rating agency, secondary-market participant, insurer, vendor, or tenant) regarding the alleged default of J&R under the Loan; and

g.  transferring, assigning, selling, or otherwise disposing of any interest in the Loan or Loan Documents pending the temporary injunction hearing.

IT IS FURTHER ORDERED that Defendants Federal National Mortgage Association and Jones Lang LaSalle Multifamily, LLC are required:

a.  within one business day of the order, to restore to the applicable Reserve and Escrow Accounts the funds JLL disbursed to itself on or about March 25, 2026, in the aggregate amount of $581,454.89, with itemization of which account each restored amount is allocated to;

b.  to process J&R's future disbursement requests under § 13.02(a)(5) and (6) of the Loan Agreement in the ordinary course, on the timelines and in the amounts provided thereunder, pending final trial; and

c.  to acknowledge the loan to be in good standing.

pending a final trial on the merits or further order of this Court.

IT IS FURTHER ORDERED, that this case shall be set for a Temporary Injunction hearing of this matter on the _____ day of _____ 2020 at ___:___ a.m./p.m. CST. in the ____ Judicial District Court of Harris County, Texas.

IT IS FURTHER ORDERED that this Temporary Restraining Order will expire on the ____ day of _____, 2024.

IT IS FURTHER ORDERED that Plaintiff will post bond in the amount of $_____ before the issuance of the Temporary Restraining Order.

The Clerk shall issue a temporary restraining order in conformity with the law and the terms of this Order.

SIGNED on this _____ day of _____ 2026.

_____
HONORABLE PRESIDING JUDGE

7

Cause No. 2026-32250

| | | | |
|---|---|---|---|
| J&R MULTIFAMILY GROUP LTD | § | IN THE DISTRICT COURT OF | Pgs-1 |
| vs.<br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION | §<br><br>§ | HARRIS COUNTY, TEXAS<br><br>151st JUDICIAL DISTRICT | TRORY |

---

### ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER

---

On this day came on to be heard Plaintiff's Application for a Temporary Restraining Order. After having reviewed the motions, responses and arguments of the parties, the Court finds that Plaintiff's Application for Temporary Restraining Order should be **DENIED**.

It is therefore,

ORDERED, that Plaintiff's Application for a Temporary Restraining Order is **DENIED**.

Signed May 14, 2026.

_____
Ancillary Judge

## 202632250, J&R MULTIFAMILY GROUP LTD vs. FEDERAL NATIONAL MORTGAGE ASSOCIATION

TX District & County - Harris (District Only)

Harris

**This case was retrieved on 05/19/2026**

## Header

**Case Number:** 202632250
**Date Filed:** 05/13/2026
**Date Full Case Retrieved:** 05/19/2026
**Status:** Open
**Misc:** (0) OTHER CONTRACT; Civil

## Details

**Case Type**: Civil
**Judge**: ERICA R. HUGHES
**Court Number**: 151st

## Participants

**Litigants**
J&R MULTIFAMILY GROUP LTD
**PLAINTIFF - CIVIL**

FEDERAL NATIONAL MORTGAGE ASSOCIATION
**DEFENDANT - CIVIL**
JONES LANG LASALLE MULTIFAMILY LLC
**DEFENDANT - CIVIL**

**Attorneys**
CHEN, LIKUN
PLAINTIFF - CIVIL
Status:  Active

## Settings

| Date | Court | Docket Type | Reason | Results | Comments | RequestingParty |
|------|-------|-------------|--------|---------|----------|-----------------|
| 05/14/2026 | 157 | Ancillary Docket In Person | TEMPORARY RESTRAINING ORDER (MOTION FOR) | Tried | DENIED O/S 5/14/2026 | CHEN, LIKUN |

## Proceedings

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/13/2026 | | Exhibit A- Affidavit. Jay Shani J&R Multifamily Group LLC | Document Number: 126664692 Order Signed Date: 05/13/2026 Pages: 5 |
| 05/13/2026 | | Exhibit A-01 | Document Number: 126664693 Order Signed Date: |

J&R MULTIFAMILY GROUP LTD v. FEDERAL NATIONAL MORTGAGE ASSOCIATION

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| | | | 05/13/2026<br>Pages:<br>33 |
| 05/13/2026 | | Exhibit A-02 | Document Number:<br>126664694<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>5 |
| 05/13/2026 | | Exhibit A-03 | Document Number:<br>126664695<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>3 |
| 05/13/2026 | | Exhibit A-04 | Document Number:<br>126664696<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>4 |
| 05/13/2026 | | Exhibit A-05 | Document Number:<br>126664697<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>12 |
| 05/13/2026 | | Exhibit A-06 | Document Number:<br>126664698<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>1 |
| 05/13/2026 | | Exhibit A-07 | Document Number:<br>126664699<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>2 |
| 05/13/2026 | | Exhibit A-08 | Document Number:<br>126664700<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>2 |
| 05/13/2026 | | Exhibit A-09 | Document Number:<br>126664701<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>1 |
| 05/13/2026 | | Exhibit A-10 | Document Number:<br>126664702<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>1 |
| 05/13/2026 | | ORIGINAL PETITION | Attorney:<br>CHEN, LIKUN |

## J&R MULTIFAMILY GROUP LTD v. FEDERAL NATIONAL MORTGAGE ASSOCIATION

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| | | | PersonFiling:<br>J&R MULTIFAMILY GROUP LTD |
| 05/13/2026 | | Plaintiffs Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction | Document Number:<br>126664691<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>34 |
| 05/13/2026 | | Proposed Temporary Restraining Order | Document Number:<br>126664703<br>Order Signed Date:<br>05/13/2026<br>Pages:<br>7 |
| 05/14/2026 | | APPEARANCE ON TEMPORARY INJ OR TEMPORARY RESTRAINING ORD | |
| 05/14/2026 | | BENCH HEARING ASSIGNED | |
| 05/14/2026 | | EVIDENCE PRESENTED (BENCH HEARING) | |
| 05/14/2026 | | HEARING HELD FOR ANOTHER COURT | |
| 05/14/2026 | | ORDER SIGNED DENYING TEMPORARY RESTRAINING ORDER | Document Number:<br>126688413<br>Order Signed Date:<br>05/14/2026<br>Pages:<br>1 |
| 05/14/2026 | | ORDER SIGNED DENYING TEMPORARY RESTRAINING ORDER (Temporary Order) | Document Number:<br>126688413<br>Order Signed Date:<br>5/14/2026<br>Pages:<br>1 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**